# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00238-CR

**Spencer Ralph Graham, Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
NOS. 20-0624-K26 & 20-0625-K26,
THE HONORABLE MICHAEL KEASLER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Spencer Ralph Graham guilty of second-degree aggravated assault with a deadly weapon and first-degree burglary of a habitation with intent to commit a felony other than theft. *See* Tex. Penal Code §§ 22.02(a)(2), 30.02(a)(1). The jury assessed his punishments at twenty years' confinement and twenty-five years' confinement, respectively, and the trial court sentenced him to the assessed punishments. *See id.* §§ 22.02(b), 30.02(d). On appeal, Graham contends in five issues that the trial court committed charge error, that he was denied effective assistance of counsel, and that the court abused its discretion by failing to hold a hearing on his motion for new trial and first amended motion for new trial. We affirm the trial court's judgments of conviction.

# BACKGROUND

A grand jury indicted Graham for aggravated assault with a deadly weapon and burglary of a habitation with intent to commit murder or aggravated assault. The facts underlying the charged offenses were largely undisputed at trial.

Miranda Ferran, Graham's ex-girlfriend with whom he had a daughter (Child), testified about her relationship with Graham and the events of April 12, 2020. Although Ferran and Graham were no longer in a "romantic relationship" in April 2020, they maintained a "physical relationship"; were developing a co-parenting plan for Child, who was nine months old; and had discussed purchasing a home and car together.

Ferran and Child spent Easter weekend at Graham's house in Leander, Texas. According to Ferran, "[i]t was an amazing weekend," and on April 12th, Easter Sunday, Graham woke up early and bought a chocolate bunny for Ferran and new outfits for Child. Ferran and Graham smoked marijuana on the back porch "on and off throughout the day," and Graham was "very happy." Ferran was "buzzed" but was not "stoned" or "very high." She testified that they had been together since she woke up and that she did not see him use any drugs other than marijuana that day.

Conflicting evidence was presented during the guilt-innocence phase regarding Graham's use of LSD, also known as acid, on April 12th. Ferran testified that he had used the drug "on and off for the two years leading up to this instance" and that she believed he had been under its influence on April 9th, three days before the charged offenses. In an officer's body-cam video, Graham, while being arrested on the 12th, stated that he had "had some drugs" but did not disclose which. Unprompted, Ferran later told the officer that Graham had not "done any

2

drugs today" but had "only smoked weed." However, her April 12th EMS and ER records, which were admitted into evidence, noted that she had informed a paramedic that Graham "took some acid" earlier in the day and told Dr. Erik Strelnieks, her treating physician, that Graham "was tripping on LSD." Ferran testified that she did not recall telling either that Graham had taken LSD that day. Graham's own EMS records noted that he was "uncooperative with EMS queries" and refused to respond to questions but was "reported to have ingested LSD 3 days previously[] and to have smoked marijuana today."

Ferran testified that around 6 p.m., Graham began acting "a bit panicked," feared that his father was coming to the house, and asked that she have sex with his father "so he could have sex with his mother and it would . . . balance out the power dynamic." She replied that "there was something there that he needs to work on," and he started crying and thanked her, which seemed "coherent, given how the weekend had been going."

At approximately 7:30 p.m., he looked into her eyes and stated, "If you and I have sex later tonight, I'm going to bring a knife into the bedroom, and I'm going to stab you and kill you while we're having sex." She urged him to go to a hospital, and he consented but then pulled her arm and demanded that she "help [him] kill the neighbors first." He told her "that somebody had to die that day and if [she] didn't want it to be [her] or him or [their] daughter that [she] would have to go and help him kill the neighbors." She attempted to calm him, but he ran off. She went inside the house, locked the doors, and called the police. She "just knew he was going to come back" and was "absolutely terrified" for her and Child's lives.

Graham, who had stripped off his clothes, eventually returned to the front door, opened a package on the porch, and rammed the door with his shoulder, shattering a glass pane

3

through which he climbed. Ferran, who had been holding the door shut, ran into Child's room, where Child was lying in her crib. Ferran braced the door with her back, but Graham "barreled through"; grabbed her by the shoulders; asked, "Do you want her to live?"; and apologized. He punched Ferran once in the face and put her in a chokehold, strangling her. Ferran testified that by this time, "it was, . . . if he doesn't kill [her] and [she] do[es]n't die, then it's going to have to be our daughter." Ferran managed to escape by squeezing his genitals and ran to the kitchen in search of an item with which to defend herself. Graham followed, and an officer arrived while they were in the kitchen.

While Graham's attention was on the officer, Ferran fled back to Child's room and uploaded a photograph of her face to Facebook with the caption, "If I die, he did it." She took Child and hid behind a barn to the rear of the house until she heard police calling for her.

Amber and Scott Ewell, Graham's neighbors, testified about their encounter with him on April 12th. The Ewells, whose daughter was four years old at the time of the offenses, had lived across the street from Graham since 2018 but had never had a conversation with him. They returned home around 7 p.m. on the 12th and were unpacking their truck and making dinner when the doorbell rang, and they heard "some very loud banging and yelling" coming from the front door. Footage from their Ring doorbell camera, admitted into evidence, showed Graham leave the door in the direction of the Ewells' open attached garage. Amber and Scott, who had gone to the front door to investigate, heard screaming and glass breaking in the garage. Because the door connecting the garage to the kitchen could not be locked, Scott held it shut for "half a second" and briefly ran for a gun on the other side of the house, but he decided instead to grab his daughter and some wooden sticks for protection and flee by the back door.

4

While Scott was going for the gun, Amber heard Graham, still in the garage, state, "I'll fucking kill you." Neither Amber nor Scott heard banging on the door to the garage or saw the doorhandle being turned. However, in a statement written around 10:30 or 11 p.m. that night, Scott wrote that Graham had been "up against the door." While fleeing through their backyard, Amber heard Graham repeatedly yell, "Hello!" As the family ran, Graham left the garage, came around the house, and entered it through the back door; although he did not run in the Ewells' direction, Amber felt that he was "coming after" them. Scott called the police, and he, Amber, and their daughter went to a neighbor's house where they jumped the fence and waited for officers to arrive.

After returning home that night following Graham's arrest, the Ewells learned that he had taken paper towels from their house, entered Scott's truck, started it, and gotten out, leaving the paper towels behind. Scott had kept bottles of vodka in the garage, and in the kitchen they discovered a glass bottle with a broken rim that was "covered in blood." Scott testified that the house's Ring footage showed Graham carrying what appeared to be a glass bottle when he entered the back door. Blood was also spattered on other objects in the house and inside the truck, and there was a shattered glass bottle on the floor of the garage.

Leander Police Department (LPD) Officer Mark Pacheco, who was the first officer to respond to the urgent call of a "physical dis[turbance] in progress," testified about Graham's arrest.[1] On Ferran's 911 call, which was admitted into evidence, she reported that she thought Graham "had a psychotic break" and was "trying to kill someone" and that "[h]e just

---

[1] The State also called LPD Officer Ty Alan Stryker as a witness, but he testified that Graham had been arrested by the time that he arrived and that he did not have much interaction with Graham.

stripped down and ran off" across the street. Scott Ewell's 911 call came in while Pacheco was en route, and he arrived at Graham's house a couple of minutes after receiving the first call.

Officer Pacheco saw Graham through the shattered pane in the front door and, observing that he was naked and unarmed, holstered his firearm and drew his Taser. Graham walked toward Officer Pacheco over the broken glass and crawled through the pane, refusing to obey Officer Pacheco's commands. In Officer Pacheco's body-cam video, which was also admitted into evidence, Graham can be heard yelling, "Give me the gun, now"; "Come inside"; and, "You don't get in here now, you die!" Officer Pacheco deployed his Taser against Graham and discharged it four times because Graham "refused to stay down" and "continued to try and get up." While lying on the ground, Graham stated that he was "out of control" and was "losing [his] mind." He broke the Taser leads, and Officer Pacheco kicked him in the head as he tried to rise. Graham briefly lost consciousness, during which time Officer Pacheco was able to handcuff him.

Officer Pacheco testified that he had received training in recognizing signs that someone was experiencing a mental health crisis, including hallucinations, "hearing voices," and "nonsensical speech." He testified that he had also had "[q]uite a bit" of experience dealing with people under the influence of drugs, that it is sometimes difficult to tell the difference between intoxication and a mental health crisis, and that someone can experience both simultaneously. He further testified that "[t]hroughout the entire incident," it had not seemed that Graham was in "any kind of state of mind where he knew what was going on."

Officer Pacheco additionally testified concerning Ferran's injuries. She had a "very obvious wound to her head," "blood coming down her face," and an eye "that was

6

completely swollen shut." There were bloodstains in Child's room, and the door to the room appeared to have been kicked in. Ferran told him that Graham had strangled her, and Officer Pacheco noticed redness on her neck. He testified that he had seen hands used as a deadly weapon and that manual strangulation can cause death. In Officer Pacheco's body-cam video, Ferran stated that Graham "really just tried to kill [her]."

Williamson County EMS paramedic Parker Harman, who was the primary medic for Ferran, testified about Graham's behavior. Graham was "in a state of just kind of really not making a whole lot of sense. He was very irate and violent, and so the decision was made to sedate him." Parker had come into contact with many people experiencing mental health crises, and Graham, who was "saying a bunch of nonsensical things," was "definitely in a crisis that did seem to have a mental component at least."

Former paramedic Justin Hurzeler, who was Parker's partner and the primary medic for Graham, testified that Graham had appeared very agitated and combative and that he told Hurzeler, "Doctor, you need to help me kill these cops," and, "I'm going to kill you all." In a report written immediately after the call, however, Hurzeler had noted Graham's remark as "Doc, if you don't kill these cops, we're all going to die." Hurzeler testified that he had no way of knowing whether Graham's "emotional mental state was caused by mental health concerns or substance abuse." He also testified that he was familiar with LSD; that in its pure form, its half-life—"the duration a medication or drug is in your system that it takes to degrade to about half of its original potency"—ranges between six and twelve hours; and that the effects of its longer-term use are "very highly dependent . . . on what else may be present" in the drug because

"[m]ost of the time," illegally obtained drugs "are laced with various other things, ranging, again, across a broad spectrum."

Dr. Strelnieks testified about the extent of Ferran's injuries. She "had suffered an assault with an injury to her face with a laceration, swelling above her left [eye]," and a "blowout fracture," also known as an orbital fracture. He explained that "[w]hen somebody is . . . struck . . . at a sufficient force, it can blow out the orbit of the eye." Ferran reported that Graham had assaulted her and that he had been "tripping on LSD." She also reported pain in her neck and stated that Graham had strangled her. Dr. Strelnieks did not observe redness on her neck but testified that hands can cause serious bodily injury or death.

At the conclusion of the guilt-innocence phase of trial, the jury found Graham guilty of aggravated assault with a deadly weapon against Ferran and burglary of the Ewells' habitation with intent to commit murder or aggravated assault. During the punishment phase, the State presented testimony from Ferran; Jaime Nicole Randall, Graham's ex-wife; and Alixandra Taylor, a friend of Ferran's. Graham called as witnesses Sergio Maldonado, his pretrial officer; Suzanne Garrard, his probation officer; Dr. Maureen Burrows, an expert forensic psychiatrist who evaluated Graham for insanity at the time of the offense; Sarah Hastings, his friend; Allison Lester, his girlfriend; and Robert Graham (Robert), his adoptive father.

Randall testified about her marriage to Graham. Although he never hit her, he was verbally abusive, would punch holes in the wall and throw things, and was intoxicated "every night." He would "either drink a case of Miller Lite, or he would smoke enough weed to go into oblivion"; on occasion she caught him with "harder drugs," including cocaine. While he had "gotten in trouble with the law," he would seek mental health treatment or go into rehab

8

"every time," and "[m]ost everything has been expunged." He had portrayed himself as more stable than he was and once spoke with their children, who were eight and six, about decapitation. On another occasion, he promised to take their son to Sea World but instead got drunk and left him at daycare. She testified that Graham was "controlling" and "manipulative" and that many of their marital problems arose from his "volatile personality in conjunction with alcohol . . . and drugs."

Taylor testified that Graham once cut his hand "[w]hile he was destroying things" and forced Ferran and another woman to clean up his blood on their hands and knees. Taylor also testified that during a separate incident, she had been upset and crying, and he slapped her across the face to calm her down.

Ferran testified about a previous time that Graham had assaulted her as well as his use of drugs and alcohol. While at a club in 2018, he got drunk and "grabbed [her] and another girl by [their] hair and he had kind of like pushed [their] heads together[,] . . . telling [them] that [they] needed to like get along and stuff." He would get "blackout drunk, very, very blackout drunk," and Ferran saw him "do . . . coke and lots of LSD"; for around two years, he would take "multiple tabs at least once a week." She was sometimes able to tell when he had taken LSD, but it "all depended on the kind of mindset that he was in at the time." She testified that she had witnessed him "faking multiple drug tests," that he had never stated that he had a problem with drugs or alcohol, and that he would only seek treatment when he was in trouble. She also testified that the blood-cleaning incident had occurred in December 2018.

Maldonado testified he had served as Graham's pretrial officer since March 2021, that Graham was required to undergo random drug testing and abstain from alcohol as conditions

of his pretrial release, and that Maldonado never received a "violation or even suspected violation of a drug sample that [Graham] provided." However, Maldonado later clarified on cross-examination that Graham had not given or been asked to give a sample during his approximately two years of release.

Garrard testified about possible conditions of community supervision, including drug testing, no-contact orders, GPS monitoring, portable alcohol monitors/ignition interlock devices, and treatment programs. She testified that the jury has no say in which conditions are imposed, that GPS and alcohol monitors are typically removed after six months if there are no violations, that the State decides when to file a motion to revoke community supervision, and that not every violation results in revocation.

Dr. Burrows testified about her pretrial insanity evaluation of Graham at his attorney's request. In preparation for Graham's evaluation, Dr. Burrows met with him three times and reviewed the police report for the offenses; Officer Pacheco's body-cam video; and Graham's April 12th ER records, 2017 hospital records, jail records, psychiatric and counseling notes, and post-arrest drug-test results. She explained that insanity consists of two components: whether someone has a mental illness or intellectual disability and if so, whether the illness or disability prevents the person from understanding the wrongness of his conduct. Dr. Burrows defined "psychotic" as "detachment from reality," including auditory or visual hallucinations; disorganized behavior; or delusion, meaning "fixed false beliefs."

According to Dr. Burrows, Graham, who "had a pretty long history of mostly depressive episodes," likely had a substance-abuse issue as well as "an underlying mood disorder." At the time of the offenses, he was "having a detachment from reality" and "a manic

10

psychosis" and was "absolutely delusional and psychotic" and "completely paranoid." Although he related much of the information that she relied on in making her determinations, she did not have the impression that he was malingering or being deceitful. She was "surprised at how forthright he was" and did not "feel like he was hiding things." Unlike two other doctors who subsequently examined Graham, she did not diagnose him with Bipolar I Disorder (BPD) but trusted the diagnosis.

Dr. Burrows noted that Graham had been "using marijuana frequently"; that "like every three weeks he would do LSD"; and that he had taken LSD three days before the offenses. She explained that people suffering from mental illness frequently self-medicate with drugs; that individuals with mood disorders are more likely to experience psychosis if they use drugs; and that because Graham had previously been diagnosed only with depression, he was unaware that he was "so vulnerable to having a psychotic episode" through drug use. Dr. Burrows concluded that substance abuse "was a factor" in the offenses; that Graham's last use of LSD "certainly kicked off this episode of psychosis"; and that "drug intoxication was at least partially, if not fully, responsible for his psychosis." Similarly, she testified that while she knew "the drugs played a role in it," she was not sure to what extent they had "kicked off the underlying" BPD and "didn't feel like it was enough evidence for [her] to support a full sanity evaluation saying that he was insane." Again stressing his inability to foresee the consequences of his drug use, she testified that she was "really impressed . . . with how terrified and how humiliated he was by this," that she did not "think he had any idea that this could have gone the way that it went," and that his behavior during the offenses as well as his children were strong motivators for him to receive treatment.

11

Dr. Burrows also testified about the quality of Graham's treatment, which was "pretty excellent." He had undergone two intensive multiweek inpatient programs, was attending therapy, and was "stabilized on medication." Graham had a "service that prevents him from faking" drug tests and "doesn't present as somebody who's currently using." His BPD had been treated "[v]ery sufficiently," and "his therapeutic outcome is high." He had "done what he's being doing successfully" and had "given us several years of already showing he" could be successful under community supervision.

On cross-examination, Dr. Burrows testified that she had not spoken with the Ewells but had written that during the offenses Graham "was looking for help from [them]." She also testified that she was unaware of the incident in which Graham demanded that Ferran and another woman clean up his blood and that although he had known of his substance-abuse issue before the offenses in this case, she was not aware of his having sought treatment and had not asked him for proof that he did.

Hastings, Lester, and Robert served as character witnesses for Graham. Lester, who had briefly dated Graham in college, testified that they rekindled their relationship in 2021, that they moved in together around March 2022, that she had never seen him drink alcohol or use illegal drugs, and that he followed the conditions of his pretrial release "religiously." On cross-examination, she testified that he had not broken her arm at a college party and that she did not remember messaging Randall about the incident. Robert testified that while growing up, Graham had attended a wilderness academy and therapeutic boarding school to address his mental-health and substance-abuse issues.

Called as a rebuttal witness by the State, Randall testified she had begun dating Graham shortly after he and Lester broke up and that Lester had reached out to her and "beg[ged] her not to date Mr. Graham" because "he was dangerous and abusive." Randall also testified that she had spoken with Graham about the incident at the party and that he had told her that Lester hit her arm against a railing. Randall testified that she later overhead a conversation between Graham and Lester in which they discussed the incident and that he "was dismissive, telling [Lester] that she was crazy, basically."

In their closing arguments, defense counsel and the State asked for probation and twenty years' confinement, respectively. The jury assessed Graham's punishment at twenty-five years' confinement for burglary of a habitation with intent to commit a felony other than theft and twenty years' confinement for aggravated assault with a deadly weapon. The trial court sentenced Graham to the assessed punishments and ordered that the sentences run concurrently.

Graham subsequently filed a timely motion for new trial and first amended motion for new trial as well as an untimely second amended motion for new trial accompanied by a motion for leave to file it. The State objected based on the untimeliness of the second amended motion for new trial, and the trial court denied Graham's motion for leave to file it. The court allowed Graham's original motion for new trial and first amended motion for new trial to be overruled by operation of law. This appeal followed.

## DISCUSSION

On appeal, Graham contends that: (1) he "was egregiously harmed by the lack of an instruction on insanity" during the guilt-innocence phase, (2) he "was egregiously harmed by the lack of an instruction on temporary insanity" during the punishment phase, (3) the trial

13

court's voluntary-intoxication instruction during the guilt-innocence phase "constituted a comment on the weight of the evidence," (4) he "was denied the effective assistance of counsel under the Sixth and Fourteenth Amendments to the Constitution of the United States," and (5) he "is entitled to a hearing on his motions for new trial." *See* U.S. Const. amends. VI, XIV, § 1.

## I.       Insanity and Temporary-Insanity Instructions

We understand Graham's first two issues to contend that the trial court erred by failing *sua sponte* to instruct the jury on (1) the affirmative defense of insanity during the guilt-innocence phase of trial and (2) temporary insanity caused by intoxication during the punishment phase. *See* Tex. Penal Code §§ 8.01, .04. Although Graham in his reply brief insists that the State "changed the issue of harm to an issue of error," we agree with the State that his analyzing the omissions exclusively in terms of harm—without first addressing whether the omissions were error—is improper. *See Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015) ("First, a reviewing court must determine if there is jury charge error. If there is error, then a harm analysis must be conducted."); *Torres v. State*, 691 S.W.3d 138, 147 (Tex. App.—Austin 2024, pet. ref'd) ("When addressing an issue regarding an alleged jury-charge error, appellate courts must first decide whether there is error before addressing whether the alleged error resulted in any harm.").

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." *See* Tex. Code Crim. Proc. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018). The court's duty exists even when defense counsel fails to object to inclusions or exclusions in the charge. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) (citing *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011)). The charge should

14

tell the jury what law applies and how it applies, *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007), and the trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions," *Mendez*, 545 S.W.3d at 552 (quoting *Delgado*, 235 S.W.3d at 249).

Article 36.14, however, "imposes no duty on a trial judge to instruct the jury *sua sponte* on unrequested defensive issues because an unrequested defensive issue is not the law 'applicable to the case.'" *Vega*, 394 S.W.3d at 519 (citing *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998) (explaining that defensive issue is not "applicable to the case" unless "the defendant timely requests the issue or objects to the omission of the issue in the jury charge"). Consequently, a defendant "cannot complain on appeal about the trial judge's failure to include a defensive instruction that [the defendant] did not preserve by request or objection: he has procedurally defaulted any such complaint." *Id.* (citing *Posey*, 966 S.W.2d at 61). This rule is consistent with the well-recognized principle that deciding which defensive issues to request is a "strategic decision[] generally left to the lawyer and the client." *Posey*, 966 S.W.2d at 63.

In his reply brief, Graham concedes that insanity is a defensive issue but argues that "voluntary intoxication cannot be characterized as a defensive issue" because "it is the antithesis of a defense." He asserts that the Court of Criminal Appeals' decision in *Mendez v. State* "controls the disposition" of his first two issues. *See* 545 S.W.3d at 549–50.

The Court of Criminal Appeals has determined that temporary insanity caused by intoxication, like insanity, is "clearly" a defensive issue. *Williams v. State*, 273 S.W.3d 200, 222 (Tex. Crim. App. 2008); *see Edwards v. State*, 691 S.W.3d 703, 717 (Tex. App.—Houston [14th Dist.] 2024, no pet.) ("Temporary insanity caused by voluntary intoxication is considered a

15

defensive issue and entitles a defendant to a mitigation instruction during the punishment phase of a trial.").

Furthermore, *Mendez* is inapposite to the present case. Graham states that the Court in *Mendez* "held that once jurors are instructed '"under what circumstances they should convict[,]"' they 'should also, then, have been informed "under what circumstances they should acquit."'" 545 S.W.3d at 555. He is mistaken regarding the Court's holding.

The Court held, rather, that a trial court commits error when it issues a defensive jury instruction sua sponte but fails to apply it to a lesser-included offense, regardless of whether counsel objects. *Id.* at 549–50. Mendez was charged with murder and argued that he acted in self-defense; the trial court instructed the jury that it could find Mendez guilty of murder or the lesser-included offense of aggravated assault and sua sponte charged that it must acquit him on the basis of self-defense if it found that he caused the victim's death but acted to protect himself. *Id.* at 550. Because the court sua sponte instructed the jury on aggravated assault and self-defense, the Court concluded, they became part of the "law applicable to the case," and the absence of a paragraph in the charge applying self-defense to aggravated assault was erroneous. *Id.* at 554–55. As the Court explained:

> If a trial court charges the jury generally upon the law of self-defense, it must apply that general charge to every lesser-included offense for which that justification would serve to "acquit" the defendant. To fail to do so is to inadequately instruct the jury as to the "law applicable to the case."

*Id.* at 555 (quoting *Vega*, 394 S.W.3d at 519).

By contrast, Graham complains here about the trial court's *failure* to issue a defensive instruction sua sponte. The Court in *Mendez* expressly distinguished such cases:

16

[I]t is uncontested that Mendez never requested a self-defense instruction on the record. The trial judge, then, initially had no duty to charge the jury on the issue of self-defense. If the court's charge had been utterly silent with respect to self-defense, Mendez would have been required to object to any resulting jury-charge error.

*Id.* at 553.

Because Graham did not request that the trial court instruct the jury on insanity or temporary insanity caused by intoxication nor object to the instructions' omission, they were not part of "the law applicable to the case," and the trial court had no duty under article 36.14 to issue them sua sponte. *See Vega*, 394 S.W.3d at 519; Tex. Code Crim. Proc. art. 36.14. Graham has procedurally defaulted on the issues and cannot complain on appeal about the court's failure to issue the instructions. *See Vega*, 394 S.W.3d at 519. We overrule his first and second issues.

## II.     Comment on the Weight of the Evidence

In his third issue, Graham contends that the trial court improperly commented on the weight of the evidence by including the following instruction in the guilt-innocence jury charge: "Voluntary intoxication does not constitute a defense to the commission of a crime. 'Intoxication' means disturbance of mental or physical capacity resulting from the introduction of any substance into the body."

Graham argues that the instruction, which is quoted verbatim from Texas Penal Code section 8.04, "became a comment to the jury that the evidence of insanity was due solely to his voluntary intoxication and should be disregarded, including on the issue of punishment." *See* Tex. Penal Code § 8.04(a), (d). He asserts that the "judge's first comment was that [Graham's] psychosis was due to LSD or marijuana or both" and that the judge's "second comment was that

17

[Graham's] break from reality was no excuse for his actions." Although Graham acknowledges that the instruction "correctly stated the law," he claims that it "nevertheless compounded the egregious harm caused by the absence of an insanity or temporary insanity instruction."

As well as requiring a trial court to instruct the jury on the law applicable to the case, article 36.14 provides that the court shall deliver to the jury a written charge "not expressing any opinion as to the weight of the evidence." Tex. Code Crim. Proc. art. 36.14. The primary reason for the rule is that an instruction "by the trial judge to the jury on the weight of the evidence reduces the State's burden of proving guilt beyond a reasonable doubt to the jury's satisfaction." *Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (quoting 43 Dix & Dawson, *Texas Practice: Criminal Practice and Procedure* § 36.36 (2d ed. 2001)). It is "axiomatic" that a trial court may not single out certain evidence and comment on it, *Russell v. State*, 749 S.W.2d 77, 78 (Tex. Crim. App. 1988), and that a charge that "assumes the truth of a controverted issue is a comment on the weight of the evidence and is erroneous," *Whaley v. State*, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986); *see Russell*, 749 S.W.2d at 78 ("[W]hen a judge, in his charge to the jury, suggests that certain evidence is true or is untrue, that is a comment on the weight of the evidence.").

To fall afoul of article 36.14, an instruction need not create a mandatory presumption or implicate a non-statutory evidentiary-sufficiency rule; on the "near end of the 'improper judicial-comment' scale" are instructions that are merely "unnecessary and fail[ ] to clarify the law for the jury" or that "obliquely or indirectly convey some opinion on the weight of the evidence by singling out that evidence and inviting the jury to pay particular attention to it." *Brown*, 122 S.W.3d at 801. Moreover, even an instruction that focuses a jury's attention on

18

a type of evidence, but "does not pluck out any specific piece of evidence," may be erroneous. *Id.*; *cf. Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019) (observing that even "innocent attempt to provide clarity for the jury by including a neutral instruction can result in an impermissible comment on the weight of the evidence" by "singl[ing] out a particular piece of evidence for special attention," which the jury may then focus on as guidance from the judge" (quoting *Rocha v. State*, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000))).

The Court of Criminal Appeals has recommended that, to ensure compliance with article 36.14, "a trial judge should, as a general rule, avoid including non-statutory instructions in the charge because such instructions frequently constitute impermissible comments on the weight of the evidence." *Beltran De La Torre*, 583 S.W.3d at 617. In determining whether an instruction is a comment on the weight of the evidence, we consider the court's charge as a whole and assess the probable effect of the instruction on the jury in the context in which it was given. *O'Connell v. State*, 17 S.W.3d 746, 748 (Tex. App.—Austin 2000, no pet.); *see Russell*, 749 S.W.2d at 79.

The challenged instruction in this case directly tracked the statutory language of section 8.04. *See Casey v. State*, 215 S.W.3d 870, 886–87 (Tex. Crim. App. 2007) (concluding that trial court did not comment on weight of evidence because "the jury charge tracked the language of the statute"); *Garza v. State*, 829 S.W.2d 291, 295 (Tex. App.—Dallas 1992, pet. ref'd) (determining that because substantively identical charge tracked section 8.04, it was not comment on weight of evidence). Subsection 8.04(a) "simply provides that intoxication is not a defense," and a defendant need not actually rely on intoxication or insanity as a defense in order to implicate the provision. *Taylor v. State*, 885 S.W.2d 154, 158 (Tex. Crim. App. 1994); *Jaynes*

*v. State*, 673 S.W.2d 198, 201–02 (Tex. Crim. App. 1984), *abrogated on other grounds by Chauncey v. State*, 877 S.W.2d 305, 308 (Tex. Crim. App. 1994). Instead, an instruction under section 8.04 is appropriate "if there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions." *Taylor*, 885 S.W.2d at 158.

There was sufficient evidence of intoxication presented at trial to raise an issue under subsection 8.04(a). *See id.* Ferran testified that she and Graham had smoked marijuana "on and off throughout" April 12th, that he had regularly used LSD prior to the offenses, and that she believed he had been under the influence of LSD on April 9th. Video from Graham's home showed the couple passing a bong back and forth on the back porch. In Officer Pacheco's body-cam video, Graham stated that he had "had some drugs," and Officer Pacheco testified at trial that he had believed that Graham "was under the influence of drugs" and that Graham had "said he had taken something." Ferran's April 12th EMS and ER records included her statements that Graham "took some acid" earlier in the day and that he "was tripping on LSD." And Graham's EMS records noted that he was "reported to have ingested LSD 3 days previously[] and to have smoked marijuana today."

Graham's primary defensive strategy at trial was to argue that—as a result of intoxication, mental illness, or a combination of both—he had lacked the ability to form the requisite intent for the charged offenses. Trial counsel questioned Officer Pacheco, Harman, and Hurzeler about Graham's mental state and the possibility that he was experiencing a mental health crisis. Officer Pacheco testified that he had received training in recognizing signs of such a crisis; that it was difficult to distinguish between "someone who's intoxicated, on drugs, or

20

[someone] experiencing a mental health crisis"; and that it appeared that Graham was not in "any kind of state of mind where he knew what was going on." Harman testified that Graham was "in a state of just kind of not really making a lot of sense" and was "definitely in a crisis that did seem to have a mental component, at least." And Hurzeler testified that he could not tell whether Graham's actions resulted from "mental illness or drug intoxication." Similarly, Ferran, who had reported to 911 that Graham was having a "psychotic break," testified that "something was very wrong with him mentally that day."

From this record, we conclude that there was evidence from which the jury could have concluded that Graham was intoxicated and that the evidence might have contributed to his lack-of-intent defense. Accordingly, the voluntary-intoxication instruction was proper and was not a comment on the weight of the evidence. *See Jaynes*, 673 S.W.2d at 201–02 (finding that similar instruction was not comment on weight of evidence where defendant argued lack of knowledge); *Haynes v. State*, 85 S.W.3d 855, 858 (Tex. App.—Waco 2002, pet. ref'd) (stating that voluntary-intoxication instruction was proper because "a jury could have concluded that [defendant] lacked the 'intent' for murder because he was intoxicated"). Despite the instruction, the jury could find that Graham lacked the necessary mens rea, as long as it did not attribute the lack to voluntary intoxication. *See Jaynes*, 673 S.W.2d at 202. We overrule his third issue.

## III. Ineffective Assistance of Counsel

In his fourth issue, Graham contends that he received ineffective assistance of counsel because trial counsel (1) failed to adequately investigate the issues of insanity and temporary insanity caused by intoxication; (2) failed to assert an insanity defense during the guilt-innocence phase of trial; (3) failed to raise temporary insanity caused by intoxication in

21

mitigation during the punishment phase; (4) gave to the State a copy of Dr. Burrows's evaluation, which was "not intended for distribution"; and (5) lacked a firm command of the facts.

Graham's claim that counsel was ineffective for failing to argue insanity during guilt-innocence was raised in his first amended motion for new trial, which was overruled by operation of law. His remaining ineffectiveness claims are raised for the first time on appeal.[2] Although ineffective-assistance claims may be brought on direct appeal, *Cannon v. State*, 252 S.W.3d 342, 347 n.6 (Tex. Crim. App. 2008) (citing *Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000)), we will review those claims separately from the claim raised in Graham's first amended motion for new trial because different standards of review apply to each category of claims, *see Straight v. State*, 515 S.W.3d 553, 564 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd); *Cavitt v. State*, 507 S.W.3d 235, 249 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

Additionally, we will not consider the evidence attached to Graham's untimely second amended motion for new trial. His sentences were imposed in this case on February 3, 2023, and the motion was filed on April 14th, seventy days later. Because the motion was filed after the thirty-day period in which Graham was permitted to file an amended motion for new trial without the trial court's leave, and the State objected to the filing, amendment was improper at that time. *See* Tex. R. App. P. 21.4(b) (authorizing defendant to

---

[2] In his original motion for new trial, Graham stated only that the trial court had discretion to order a new punishment hearing and "to grant a new trial in the interests of justice." In his first amended motion for new trial, he claimed that counsel was ineffective for failing to communicate a particular plea offer to Graham and for failing "to assert an available defense, i.e., insanity."

22

amend motion for new trial without leave within thirty days of sentence's imposition as long as trial court has not ruled on motion); *State v. Zalman*, 400 S.W.3d 590, 593 (Tex. Crim. App. 2013) (noting that Court of Criminal Appeals has interpreted rule 21.4(b) "as barring amendments outside of the thirty-day time limit, even with leave of the court, so long as the State properly objects"). "Evidence presented to the trial court in support of an untimely amendment should not be considered part of the record on appeal." *State v. Frias*, 511 S.W.3d 797, 808 (Tex. App.—El Paso 2016, pet. ref'd); *see Cueva v. State*, 339 S.W.3d 839, 859 (Tex. App.—Corpus Christi–Edinburg 2011, pet. ref'd); *Heckathorne v. State*, 697 S.W.2d 8, 10 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd).

To establish ineffective assistance of counsel, an appellant must demonstrate by a preponderance of the evidence both deficient performance by counsel and prejudice suffered by the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). The appellant must first demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88; *Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017). Appellate review of counsel's representation is highly deferential; we must "indulge in a strong presumption that counsel's conduct was not deficient." *Nava v. State*, 415 S.W.3d 289, 307–08 (Tex. Crim. App. 2013); *see Strickland*, 466 U.S. at 689. The appellant must then show the existence of a reasonable probability—one sufficient to undermine confidence in the outcome—that the result of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 694; *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). "Failure to make the required showing of either deficient

performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *accord Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

### A. Failure to Raise Insanity Defense

Because Graham claimed in his first amended motion for new trial that counsel was ineffective for failing to assert an insanity defense, we must determine whether the trial court abused its discretion in denying the motion. *See Crucet v. State*, 658 S.W.3d 799, 802 (Tex. App.—Waco 2022, pet. ref'd); *Robinson v. State*, 514 S.W.3d 816, 823 (Tex. App.— Houston [1st Dist.] 2017, pet. ref'd); *Najar v. State*, 618 S.W.3d 366, 371 (Tex. Crim. App. 2021). A trial court abuses its discretion "when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably." *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). Stated differently, a trial court abuses its discretion only when no reasonable view of the record could support the ruling. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). In reviewing for an abuse of discretion, "we view the evidence in the light most favorable to the court's ruling and give almost total deference to the court's findings of historical fact." *State v. Gutierrez*, 541 S.W.3d 91, 98 (Tex. Crim. App. 2017). When the trial court makes no findings, as here, we infer all findings necessary to support the judgment. *Id.*

The Texas Penal Code provides that "[i]t is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code § 8.01(a). A defendant is presumed to be sane and to have intended "the natural consequences of his acts." *Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008). The defendant bears the burden of proving insanity by a preponderance of the evidence. *Id.* at 591–92. Expert testimony is not necessary to

24

raise the issue; rather, "predicated lay opinion testimony when considered with facts and circumstances concerning an accused and of the offense may be sufficient." *Pacheco v. State*, 757 S.W.2d 729, 736 (Tex. Crim. App. 1988).

As an affirmative defense, insanity "excuses the person from criminal responsibility even though the State has proven every element of the offense, including the *mens rea*, beyond a reasonable doubt." *Ruffin*, 270 S.W.3d at 592. "Wrong" in the context of insanity "means 'illegal.'" *Id.* "Thus, the question for deciding insanity is this: Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified?" *Id.*

Subsections 8.01(a) and 8.04(a) must be read in tandem. As a result, a defendant's lack of knowledge that his conduct was wrong must result from a "severe mental disease or defect" and not from voluntary intoxication. *See* Tex. Penal Code §§ 8.01(a), .04(a). In other words,

> if the pre-existing condition of mind of the accused is not such as would render him legally insane in and of itself, then the recent use of intoxicants causing stimulation or aggravation of the pre-existing condition to the point of insanity cannot be relied upon as a defense to the commission of the crime itself.

*Evilsizer v. State*, 487 S.W.2d 113, 116 (Tex. Crim. App. 1972). This Court has likewise recognized that subsection 8.04(a) "'nowhere limits the degree of attenuation that might exist between the voluntary ingestion of a substance and a resulting mental disturbance,' and 'psychosis directly or indirectly caused by the use of the drug,' including through withdrawal from the drug, 'is included within the statutory definition of intoxication.'" *Cooper v. State*, No. 03-19-00007-CR, 2020 WL 5752920, at *2 (Tex. App.—Austin Sept. 23, 2020, pet. ref'd)

25

(mem. op., not designated for publication) (quoting *Afzal v. State*, 559 S.W.3d 204, 214 (Tex. App.—Texarkana 2018, pet. ref'd)).

Attached to Graham's first amended motion for new trial were Dr. Burrows's evaluation; emails exchanged between trial counsel and the State; and affidavits from trial counsel and Dr. Jennifer Schaefer, Graham's treating psychiatrist since approximately a month after the offenses. In her evaluation, Dr. Burrows stated that prior to forming her professional opinion as to whether Graham was insane at the time of the offenses, she had reviewed the police report; Graham's medical and counseling records; Dr. Schaefer's notes; and the results of a psychological evaluation of Graham performed by Dr. S. Thorne. Dr. Burrows noted Graham's regular use of LSD and marijuana prior to the offenses and concluded:

> It is my opinion with a reasonable degree of medical probability that the defendant was **psychotic at the time of the offense.** However, due to his LSD use ~three days prior to the offense which initiated his euphoria, and his significant cannabis use on the day of the offense, in addition to a history of no prior episodes of psychosis, it is likely that his psychosis was at least partially, if not fully, drug-induced due to his voluntary intoxication . . . .
>
> It is my opinion with a reasonable degree of medical probability that the defendant **did not know** the wrongfulness of his acts at the time of the offense.

In summary, she stated that Graham "is not a candidate for an insanity defense due to his voluntary drug intoxication which is at least partially, if not fully, responsible for his psychosis."

Trial counsel attested in his affidavit that he "was aware that Mr. Graham had a history of mental illness and that he had some kind of psychotic episode on April 12, 2020"; that counsel engaged Dr. Burrows "to evaluate [Graham] for sanity and/or provide mitigation

26

testimony concerning his history of mental illness"; and that although Dr. Burrows "believed Mr. Graham suffered from mental illness and that he did not know the wrongfulness of his conduct on April 12, 2020, she could not support a plea of not guilty by reason of insanity due to Mr. Graham's concurrent drug abuse on the day of the offense." Counsel averred that based on Dr. Burrows's conclusions, he "did not file a notice of intent to pursue the defense of insanity."

Appellate counsel, who filed Graham's first amended motion for new trial, stated in the motion that counsel "believe[d] he can prove this defense [of insanity]" and that it was Graham's "only defense." On appeal, Graham argues without citation to authority that "evidence of voluntary intoxication . . . does not preclude an insanity defense" and that "[t]he evidence regarding LSD did not prevent in any way the assertion of insanity." He asserts that had trial counsel spoken with additional experts, whose affidavits were attached only to the untimely second amended motion for new trial, he would have understood "the strength of th[e insanity] defense."

The trial court would not have abused its discretion in concluding that trial counsel acted reasonably in deciding not to advance an insanity defense during the guilt-innocence phase. *See Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986) (finding that "counsel did not err by failing to raise a non-existent defense at trial"). The evidence presented at trial—reflected in Dr. Burrows's evaluation and its quotation of excerpts from Dr. Schaefer's intake notes—demonstrates that Graham's mental illness and drug use were inextricably intertwined. His regular use of LSD seemingly triggered his psychotic episode on April 12, 2020. Whether he last used the drug three days before or that day—as multiple witnesses testified that Ferran had reported—his voluntary intoxication would have

27

rendered insanity at best an inadvisable defense. *See Evilsizer*, 487 S.W.2d at 116; *Cooper*, 2020 WL 5752920, at *2; *Afzal*, 559 S.W.3d at 214. Even the excerpted note from Dr. Schaefer, who Graham suggests would have more strongly supported a conclusion of insanity, stated that his "history of polysubstance abuse significantly complicates his clinical presentation," that his manic episode at the time of the offenses occurred "[i]n the context of ongoing heavy daily marijuana use and sporadic LSD use," and that "[o]ne would expect a shorter symptom duration at a lower intensity and likely without residual paranoia if the episode was *purely* substance induced." (Emphasis added.) Our conclusion is unaffected by appellate counsel's belief that he would have succeeded in pursuing an insanity defense. *See Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) ("The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel.").

Instead of raising the issue of insanity, trial counsel made a reasoned decision to argue that the State could not prove the offenses' mens rea elements beyond a reasonable doubt. *See Ruffin*, 270 S.W.3d at 596 (recognizing that evidence may be admitted to negate mens rea element and that such evidence may include evidence of defendant's history of mental illness). Under the facts of this case, the trial court would not have abused its discretion in declining to find that counsel was deficient in pursuing such a strategy. *See Faz v. State*, 510 S.W.2d 922, 926 (Tex. Crim. App. 1974) ("[C]ounsel's failure to assert insanity as a defense appears to have been a strategical move, the propriety of which is not open to question under these circumstances."), *overruled on other grounds by Moon v. State*, 572 S.W.2d 681 (Tex. Crim. App. 1978). The trial court did not abuse its discretion by denying Graham's first amended

28

motion for new trial with respect to this claim. *See Najar*, 618 S.W.3d at 371; *Young*, 591 S.W.3d at 595.

### B.      Claims Raised for First Time on Appeal

To rebut the strong presumption that counsel's representation was not deficient, a claim of ineffective assistance must be "firmly founded in the record," which "must affirmatively demonstrate" the meritorious nature of the claim. *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Rarely will the trial record by itself be sufficient. *Nava*, 415 S.W.3d at 308; *see Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017) (observing that "record on direct appeal is generally insufficient to show that counsel's performance was deficient"). "Ordinarily, trial counsel should be afforded an opportunity to explain his conduct before being denounced as ineffective." *Sandoval v. State*, 665 S.W.3d 496, 545 (Tex. Crim. App. 2022). If trial counsel has not been afforded the opportunity to explain the reasons for his conduct, "we will assume a strategic motive, if one can be ascertained, and find counsel deficient only if his conduct was so outrageous that no competent attorney would have engaged in it or, stated differently, if no reasonable trial strategy could justify counsel's actions." *Hart v. State*, 667 S.W.3d 774, 783 (Tex. Crim. App. 2023).

Although an affidavit from trial counsel accompanied Graham's first amended motion for new trial, Graham subsequently raised new ineffective-assistance grounds in his untimely second amended motion for new trial and for the first time in this Court. When counsel's affidavit was sworn, the only grounds for ineffectiveness that had been made involved counsel's alleged failure to communicate a plea deal to Graham and counsel's failure to assert an

29

insanity defense during the guilt-innocence phase. Consequently, the record in this case is largely silent as to counsel's reasoning for the actions Graham now challenges, which counsel was not given an opportunity to explain. *See id.*

### i. Inadequate Investigation

Graham argues that trial counsel failed to investigate adequately the issues of insanity and temporary insanity caused by intoxication. He asserts that counsel should have reached out to other experts more sympathetic to an insanity defense. While affidavits from additional experts were submitted in support of Graham's untimely second amended motion for new trial, we will not consider them in this appeal for the reasons discussed above. *See Frias*, 511 S.W.3d at 808; *Cueva*, 339 S.W.3d at 859; *Heckathorne*, 697 S.W.2d at 10.

"Counsel has a duty to make a proper investigation and prepare for trial." *Ex parte Langley*, 833 S.W.2d 141, 143 (Tex. Crim. App. 1992). "When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further." *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006) (citing *Wiggins v. Smith*, 539 U.S. 510, 527 (2003)). A claim based on an inadequate investigation "will fail in the absence of 'a showing of what an investigation would have revealed that reasonably could have changed the result of the case.'" *Young*, 591 S.W.3d at 606 (quoting *Straight*, 515 S.W.3d at 568).

Trial counsel's duty to investigate "does not extend to obtaining the 'best' or most highly qualified" expert; "the proper focus is on counsel's investigation, not counsel's choice of a specific expert," and counsel must only "obtain competent expert assistance." *Ex parte Flores*,

387 S.W.3d 626, 636 & n.48 (Tex. Crim. App. 2012) (citing *Crittenden v. Ayers*, 624 F.3d 943, 965–66 (9th Cir. 2010) ("Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts."); *McLaughlin v. State*, 378 S.W.3d 328, 343 (Mo. 2012) ("Trial counsel's selection of which expert witnesses to call at trial is generally a question of trial strategy and is virtually unchallengeable . . . . [C]ounsel is not obligated to shop for an expert witness who might provide the most or more favorable testimony." (internal citation omitted))). Whether to hire an expert is a strategic decision entitled to a strong presumption of reasonableness. *Dunn v. Reeves*, 594 U.S. 731, 739 (2021).

Trial counsel did not act unreasonably in declining to consult additional experts. Dr. Burrows, whose qualifications Graham does not dispute, relied on several sources of information, including other practitioners' professional assessments, in reaching her opinion. Her evaluation was well-reasoned and thorough, and Graham has pointed to nothing that should have undermined counsel's confidence in her judgment. Following the evaluation, counsel made a strategic decision to focus at trial on challenging the State's ability to prove Graham's culpable mental state. *See Wiggins*, 539 U.S. at 527 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Ex parte Martinez*, 195 S.W.3d at 721. Counsel satisfied his obligation to obtain a competent expert on whose opinion he was entitled to rely, not one who endorsed a particular legal strategy. *See Ex parte Flores*, 387 S.W.3d at 636; *Crittenden*, 624 F.3d at 965–66; *McLaughlin*, 378 S.W.3d at 343. Moreover, on the record before us, Graham has failed to show that obtaining the services of more experts could have reasonably changed the outcome of his trial. *See Young*, 591 S.W.3d at 606; *Straight*, 515 S.W.3d at 568. In light of the strong

presumption of counsel's reasonableness, we cannot say that his performance was deficient.  *See Dunn*, 594 U.S. at 739; *Strickland*, 466 U.S. at 687.

### ii.     Temporary Insanity Caused by Intoxication

Next, Graham argues that counsel was ineffective for failing to argue temporary insanity caused by intoxication as a mitigating circumstance during the punishment phase or to request an instruction under subsection 8.04(b).  *See* Tex. Penal Code § 8.04(b) (providing that "[e]vidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried").

Dr. Burrows was called as a punishment witness by trial counsel and, without specifically stating that Graham was temporarily insane during the offenses, testified about the mitigating effect of Graham's intoxication-induced mental state.  Dr. Burrows testified that at the time of the offenses, Graham was "absolutely delusional," "manic," "psychotic," "detach[ed] from reality," and "completely paranoid."  She testified that people with mental illness frequently self-medicate with drugs and alcohol, that "both the mood disorder and the drugs played a role" in the incident, and that Graham's substance abuse "was a factor in the offense."

She also testified that Graham's psychosis was unforeseeable to him.  She did not "think he had any idea that this could have gone the way it went."  He was "absolutely terrified and humiliated by this experience," and because he had been diagnosed only with depression, he was not "as aware that he was so vulnerable to having a psychotic episode."  She further testified that Graham had been sober since the offenses, that his therapeutic outcome was high, that he was strongly motivated, and that he had shown for several years that he could be successful on probation.

Echoing Dr. Burrows's testimony, trial counsel argued in closing that April 12th was "absolutely the worst day of []Graham's life." Counsel emphasized that Graham had been "out of his mind" and framed his actions as a "drug-fueled psychotic break from reality" but insisted that he had since had "total sobriety" and had finally been correctly diagnosed and prescribed the appropriate medications. Counsel stated that Graham's intoxication was "not a legal excuse" and that he and counsel respected the jury's verdict. But counsel argued that as long as Graham continued his treatment and maintained his sobriety, "[t]his isn't going to happen again."

While counsel's affidavit notes that he engaged Dr. Burrows in part to possibly "provide mitigation testimony concerning [Graham's] history of mental illness" and that she testified during the punishment phase, the affidavit is silent concerning counsel's strategy during the punishment phase and his reasons for declining to argue temporary insanity or to request a subsection 8.04(b) instruction. *See Okonkwo v. State*, 398 S.W.3d 689, 697 (Tex. Crim. App. 2013) ("Even if the law permitted counsel to obtain an instruction on mistake of fact under these circumstances, the failure to request the instruction was not objectively unreasonable because defensive issues 'frequently depend upon trial strategy and tactics.'" (quoting *Tolbert v. State*, 306 S.W.3d 776, 779–82 (Tex. Crim. App. 2010))). This is not "the rare case in which trial counsel's ineffectiveness is apparent from the record." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). Counsel's actions are entitled to a strong presumption of reasonableness, and we assume that he had a strategic motive for them. *See Hart*, 667 S.W.3d at 783; *Menefield*, 363 S.W.3d at 592. Indeed, counsel may have fairly reasoned that more explicitly arguing that Graham's drug use rendered him temporarily insane would have

33

highlighted the use of illegal drugs, undermined Dr. Burrows's testimony that Graham's actions were also partially caused by mental illness, and contradicted counsel's argument that Graham took responsibility and respected the jury's guilty verdict. Because a reasonable trial strategy could have justified counsel's actions, we conclude that he was not deficient. *Strickland*, 466 U.S. at 687; *Hart*, 667 S.W.3d at 783.

### iii. Providing State with a Copy of Dr. Burrows's Evaluation

Graham also argues that trial counsel was ineffective for providing a copy of Dr. Burrows's evaluation to the State during the parties' plea negotiations. Graham asserts that the evaluation was "not intended for distribution" and that "[c]onsequently, the prosecution, in light of the undisputed evidence of [Graham]'s conduct, knew that there would be no defense to the easily proven facts of [his] conduct."

Counsel's affidavit states only that the evaluation "was provided to the State in plea negotiations with the express written permission of Mr. Graham." In an email attached as an exhibit to the affidavit, counsel wrote to the State's attorney:

> I will be seeing you this afternoon but wanted you to have a copy of Dr. Burrows'[s] report so I am forwarding it to you, attached. I look forward to discussing this case further with you and will make Dr. Burrows available to you for any follow-up questions you may have for her.
>
> As you can see, she cannot say that my client was legally insane at the time of the offense but she does believe that he was experiencing a severe psychiatric event which was likely triggered or at least exacerbated by drug abuse. She also finds that he did not know his conduct was wrongful due to his illness and impairment. This may be admissible in guilt-innocence as proof of lack of culpable mental state, but in any case is offered in mitigation of punishment. Please note that Mr. Graham has been regularly getting 90-day nail-bed tests to prove his continued abstinence from any illegal drugs. His supervised visits with his children have been going very well, according to the supervisors.

We are open to discussing any outcome that does not involve sending this father of three young children to prison.

Dr. Burrows's evaluation contradicts Graham's assertion on appeal that it was not intended for distribution. The evaluation states:

> Prior to the beginning of the evaluation, [Graham] was informed that the information gathered from this evaluation as well as a summary of its findings would be documented herein and provided to [his] attorney, and possibly with the prosecuting attorney, and the Court . . . . [Graham] acknowledged understanding of these disclosures and notice of non-confidentiality through verbal means prior to the evaluation commencing and [he] agreed to proceed with the evaluation.

Giving a copy of the evaluation to the prosecution appears to have been an intentional, strategic decision made to facilitate plea negotiations and obtain a better offer from the State. In the absence of counsel's opportunity to respond to the claim, we will not say that his action was deficient. *See Strickland*, 466 U.S. at 687; *Hart*, 667 S.W.3d at 783; *Sandoval*, 665 S.W.3d at 545.

### iv. Command of the Facts

Lastly, Graham argues that counsel "misperce[ived]" or possessed "a lack of command" of the facts because he stated in his affidavit that "he thought [Graham] had ingested LSD that day [April 12, 2020]." Counsel in fact attested that Dr. Burrows had opined that she "could not support a plea of not guilty by reason of insanity due to Mr. Graham's concurrent drug abuse on the day of the offense."

Among counsel's duties is that of making an independent investigation of the facts of his client's case. *Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex. Crim. App. 1978); *see Ex parte Lilly*, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983) ("It is fundamental that an attorney

35

must have a firm command of the facts of the case as well as the law before he can render reasonably effective assistance of counsel.").

In her evaluation, Dr. Burrows noted that Graham had smoked marijuana on April 12th, that he regularly used LSD and reported having used it on April 9th, and that Ferran "suspects [he] used again." Dr. Burrows's opinion, in relevant part, was that

> due to Graham's LSD use ~three days prior to the offense which initiated his euphoria, *and his significant cannabis use on the day of the offense*, in addition to a history of no prior episodes of psychosis, it is likely that his psychosis was at least partially, if not fully, drug-induced due to his voluntary intoxication.

(Emphasis added.)

Accordingly, counsel was not incorrect in his characterization of Dr. Burrows's opinion, and we conclude that Graham has failed to show that counsel lacked a command of the facts sufficient to render his representation ineffective. *See Strickland*, 466 U.S. at 687; *Ex parte Ewing*, 570 S.W.2d at 947. To the contrary, the record—including counsel's questioning of the State's witnesses during both phases of trial and direct examination of defense witnesses during the punishment phase—reveals a strong grasp of the facts by counsel.

Having concluded that counsel's performance was not deficient, we overrule Graham's fourth issue. *See Strickland*, 466 U.S. at 687; *Perez*, 310 S.W.3d at 893.

## IV. Motion for New Trial Hearing

In his fifth issue, Graham contends that the trial court abused its discretion by failing to hold a hearing on his "motions for new trial."

36

"The right to a hearing on a motion for new trial is not absolute." *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). A hearing on a motion for new trial is mandatory only when the trial court determines that the motion and accompanying affidavit(s) raise matters that are both not determinable from the record and reasonable, meaning they could potentially entitle the defendant to relief. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009); *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). The trial judge's discretion and our review are limited to these two requirements. *Smith*, 286 S.W.3d at 340. To be sufficient to entitle the defendant to a hearing, the motion and affidavit(s) need not establish a prima facie case for a new trial or reflect every component legally required to establish relief but must "reflect that reasonable grounds exist for holding that such relief could be granted." *Wallace*, 106 S.W.3d at 108 (quoting *Martinez v. State*, 74 S.W.3d 19, 22 (Tex. Crim. App. 2002)); *see Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994); *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993). "The requirement of an affidavit is to prevent 'fishing expeditions' and is a prerequisite to obtaining a hearing and as a matter of pleading." *Klapesky v. State*, 256 S.W.3d 442, 454 (Tex. App.—Austin 2008, pet. ref'd) (citing *Reyes*, 849 S.W.2d at 816; *McIntire v. State*, 698 S.W.2d 652, 658 (Tex. Crim. App. 1985)).

We review a trial court's denial of a hearing for an abuse of discretion. *Wallace*, 106 S.W.3d at 108; *Corporon v. State*, 586 S.W.3d 550, 557 (Tex. App.—Austin 2019, no pet.). "In so doing, we reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Smith*, 286 S.W.3d at 339. The question is not whether the trial court has reasonably denied the motion for a new trial but

rather whether the court has reasonably denied the defendant a hearing on his motion for a new trial. *See Wallace*, 106 S.W.3d at 108.

Graham's original motion for new trial was unsupported by affidavit and asserted only that the trial court had discretion to order a new punishment hearing and "to grant a new trial in the interests of justice." Because the motion was not accompanied by an affidavit setting out the factual basis for the claim, the trial court did not abuse its discretion by refusing to hold a hearing on the matter. *See Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009) (stating that "no hearing is required" when new-trial motion is not supported "an affidavit specifically setting out the factual basis for the claim"). Likewise, because the State objected to Graham's untimely second amended motion for new trial, the trial court properly declined to consider its merits. *See Clarke v. State*, 270 S.W.3d 573, 581 (Tex. Crim. App. 2008); *State v. Moore*, 225 S.W.3d 556, 570 (Tex. Crim. App. 2007); *see also Heckathorne*, 697 S.W.2d at 10 ("Untimely amended motions for new trial are a nullity and cannot form the basis for points of error on appeal.").

Thus, the remaining question is whether the trial court abused its discretion by not holding a hearing on Graham's first amended motion for new trial, in which he raised two issues: (1) trial counsel failed to communicate an offer from the State allowing Graham to plead guilty to second-degree aggravated assault and burglary of a habitation, and (2) counsel was ineffective for failing to raise the affirmative defense of insanity during the guilt-innocence phase. We have discussed the latter claim above and conclude that the trial court could have determined from the record that Graham did not demonstrate reasonable grounds for believing that counsel's performance was deficient. *See Rozell*, 176 S.W.3d at 230; *Smith*, 286 S.W.3d at 338 ("[A]

38

hearing is *not* required when the matters raised in the motion for new trial are subject to being determined from the record.").

The former claim is directly contradicted by the record. As evidence that counsel did not communicate the State's offer, Graham references a pretrial hearing at which, he asserts, "[e]ach side related plea offers," but neither mentioned the offer allowing him to plead guilty to two second-degree felonies, indicating that it was "not sufficiently, if at all, conveyed to Mr. Graham." However, the following exchange occurred during the hearing, which was held on March 8, 2022:

> THE STATE: The – I was just going to put the offers that have been discussed on the record so that the defendant could formally reject them.
>
> What we had – I had discussed with [defense counsel] is allowing the defendant to plead open to the first[-]degree burglary as charged and then dismissing the aggravated assault as part of that plea or, alternatively, *allowing him to plead to a second[-]degree burglary and the aggravated assault*[3] *and go open to the Court.* Those are the two kind of alternate offers, but my understanding is that both of those have been rejected.
>
> DEFENSE COUNSEL: That's correct, Your Honor.
>
> THE COURT: Mr. Graham?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: You have fully discussed the options that the State has proposed. [Defense counsel] has indicated as such.
>
> THE DEFENDANT: Yes, ma'am.

(Emphasis added.)

---

[3] Graham was indicted for second-degree aggravated assault.

Because Graham's issues were determinable from the record, and he did not demonstrate that he was potentially entitled to relief, the trial court did not abuse its discretion by declining to hold a hearing on his first amended motion for new trial.[4] *See Briggs v. State*, 560 S.W.3d 176, 183–84 (Tex. Crim. App. 2018); *Wallace*, 106 S.W.3d at 108. We overrule his fifth issue.

## CONCLUSION

Having overruled each of Graham's issues, we affirm the trial court's judgments of conviction.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: April 4, 2025

Do Not Publish

_____

[4] In his reply brief, Graham states that "[t]he trial court did not abuse its discretion because it did not exercise its discretion" and that instead, "[t]the time for holding a hearing simply ran out, and the motions were overruled by operation of law." To the extent that this is intended as an argument against the trial court's decision not to hold a hearing, it is without merit. *See Montelongo v. State*, 623 S.W.3d 819, 824 (Tex. Crim. App. 2021) (recognizing that trial court's failure to hold hearing on motion new trial that is overruled by operation of law is reviewed for abuse of discretion); *Frangias v. State*, 450 S.W.3d 125, 144 (Tex. Crim. App. 2013) (noting that trial court "allowed the motion for new trial to be denied by operation of law" and referring to "the question of whether it was within the trial court's considerable discretion to allow the motion for new trial to be denied by operation of law").