

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00228-CR
_____

SHAYNE DANIEL AFZAL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 45145-B

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Chief Justice Morriss

# O P I N I O N

In response to an early-morning report of trouble, police officers arrived at a Longview apartment complex occupied by Shayne Daniel Afzal and others. As the officers approached the apartment that appeared to be the epicenter of the trouble, they heard "several blasts" coming from what sounded like a shotgun. After officers took cover, they heard Afzal "screaming unintelligibly." They observed him repeatedly opening the apartment door, appearing outside, yelling, firing the gun, and then closing the door.

After officers got control of the situation and arrested Afzal, he was charged in a single indictment with one count of aggravated assault of a public servant and one count of aggravated assault.[1] The trial court rejected Afzal's insanity defense, found him guilty of both offenses,[2] and ultimately sentenced Afzal to thirty years' imprisonment on the charge of aggravated assault of a public servant and twenty years' imprisonment on the charge of aggravated assault, with the two sentences to run concurrently. On appeal, Afzal challenges the legal and factual sufficiency of the trial court's rejection of his insanity defense. We affirm the judgment of the trial court.

---

[1]In count one of the indictment, the State alleged that, on February 19, 2015, Afzal

> intentionally or knowingly threaten[ed] Steven Burt with imminent bodily injury by discharging a firearm at or in the direction of Steven Burt, and [Afzal] did then and there use or exhibit a deadly weapon, to wit: a firearm, during the commission of said assault, and [Afzal] did then and there know that the said Steven Burt was then and there a public servant, to wit: a peace officer employed by the Longview Police Department, and that the said Steven Burt was then and there lawfully discharging an official duty, to-wit: responding to a shots-fired dispatch call . . . .

Count two of the indictment alleged that, on February 19, 2015, Afzal "did then and there intentionally or knowingly threaten Autumn Kahn with imminent bodily injury by discharging a firearm at or in the direction of Autumn Kahn, and [Afzal] did then and there use or exhibit a deadly weapon, to-wit: a firearm, during the commission of said assault."

[2]At trial, Afzal stipulated to committing the offenses alleged in both counts of the indictment.

2

Afzal claims that the trial court erred when it rejected his insanity defense. Insanity is an affirmative defense. TEX. PENAL CODE ANN. § 8.01(a) (West 2011). "The purpose of the insanity defense issue is to determine whether the accused should be held responsible for a crime, or whether a mental condition will excuse holding him responsible." *Graham v. State*, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978). To establish the defense Afzal must have proven "that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, . . . did not know that his conduct was wrong." *See id.* 943, 948 (quoting TEX. PENAL CODE ANN. § 8.01(a)). "The term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *Id.* at 943 (quoting TEX. PENAL CODE ANN. § 8.01(b)).

Defendants are presumed to be sane, and the State carries no burden to prove sanity. *Manning v. State*, 730 S.W.2d 744, 748 (Tex. Crim. App. 1987); *Sims v. State*, 807 S.W.2d 618, 626 (Tex. App.—Dallas 1991, pet. ref'd). A defendant asserting the affirmative defense of insanity bears the burden of proof and the burden of persuasion. *Meraz v. State*, 785 S.W.2d 146, 150 (Tex. Crim. App. 1990). To succeed on such claim, the defendant must prove by a preponderance of the evidence that he or she was insane during the commission of the offense. TEX. PENAL CODE ANN. § 2.04 (West 2011).

The issue of insanity is not strictly medical in nature, however. *Bigby v. State*, 892 S.W.2d 864, 877 (Tex. Crim. App. 1994); *Love v. State*, 909 S.W.2d 930, 943 (Tex. App.—El Paso 1995, pet. ref'd). A person may be medically insane, yet legally retain criminal responsibility for a crime where a mental condition does not prevent him from distinguishing right from wrong. *Graham*, 566 S.W.2d at 948. When determining the issue of legal insanity, the trier of fact is called on to

3

consider the nonmedical evidence in deciding the ultimate issue of culpability. *Bigby*, 892 S.W.2d at 878. Expert witnesses, although certainly capable of giving testimony that may assist the jury in determining the issue, do not dictate the result. *Graham*, 566 S.W.2d at 949. However, the fact-finder may not arbitrarily disregard expert testimony. *Id.* at 950. "Ultimately the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the [fact-finder], not only as to the credibility of the witnesses and weight of the evidence, but also as to the limits of the defense itself." *Graham*, 566 S.W.2d at 952.

When we consider the legal and factual sufficiency of the evidence in dealing with "those few instances in criminal cases in which the burden of proof is a preponderance of the evidence," such as affirmative defenses, we are to use the civil standards for legal and factual sufficiency. *See Brooks v. State*, 323 S.W.3d 893, 924 (Tex. Crim. App. 2010) (plurality op.) (Cochran, J., concurring). If an appellant contends that there is no evidence to support an adverse finding on which he or she has the burden of proof, we construe the issue as a claim that the contrary was established as a matter of law. *Matlock v. State*, 392 S.W.3d 662, 669 (Tex. Crim. App. 2013) (citing the civil standard of review for legal sufficiency in *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). In *City of Keller*, the Texas Supreme Court explained,

> The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

*City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). If we find no evidence to support the finding, we then determine whether the contrary was established as a matter of law. *Matlock*, 392

4

S.W.3d at 669. If there was some evidence,[3] then the appellate court must reject the appellant's legal-sufficiency argument. In other words, "[o]nly if the appealing party establishes that the evidence conclusively proves his affirmative defense and 'that no reasonable jury was free to think otherwise, may the reviewing court conclude that the evidence is legally insufficient to support the jury's rejection of the defendant's affirmative defense." *Id.* at 670.

When reviewing the factual sufficiency of a fact-finder's rejection of an affirmative defense, "an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the [fact-finder] by substituting its judgment in place of the [fact-finder]'s assessment of the weight and credibility of the witnesses' testimony." *Id.* at 671 (citing *Meraz*, 785 S.W.2d at 154). Thus, an appellate court may sustain an appellant's claim of factual insufficiency only if, after setting forth the relevant evidence and explaining specifically how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly explains why the verdict is so much against the great weight of the evidence as to be manifestly unjust or clearly biased. *City of Keller*, 168 S.W.3d at 807. Rarely will the fact-finder's determination regarding an insanity defense be overturned on appeal. *Graham*, 566 S.W.2d at 953. Accordingly, because the trial court is the sole judge of the credibility and weight to be given to the testimony, that court is free to believe or disbelieve all or part of any witness's testimony. *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex. Crim. App. 1993).

---

[3]In *Matlock*, the Texas Court of Criminal Appeals noted that there must be "more than a mere scintilla" of evidence to support the fact-finder's determination. *Matlock*, 392 S.W.3d at 669. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* at 669 n.21 (quoting *Ford Motor Co. v. Ridgeway*, 135 S.W.3d 598, 601 (Tex. 2004)).

Afzal maintains that the trial court's rejection of his insanity defense was flawed because (1) the trial court ignored the overwhelming evidence that Afzal's psychosis was a result of a head injury that he suffered less than four months before the incident, not a benzodiazepine withdrawal, and (2) it was error for the trial court to find that Afzal's insanity defense was barred by Section 8.01(b) of the Texas Penal Code.[4]

A review of some of the evidence will be helpful to our discussion of Afzal's insanity defense.

Longview police officers Donald Lee Appleman, Jr., and Dustin Ashworth were dispatched to Afzal's apartment complex in response to the disturbance. Officers were concerned early on that Afzal might have been holding a hostage inside his apartment. The scene drew additional Longview officers, including Kerry Higginbotham, a patrol supervisor, and, eventually, the Special Weapons and Tactics (S.W.A.T.) team. Officers evacuated residents living in the nearby apartments, but were unable to evacuate Afzal's next-door neighbor, Autumn Kahn, the victim

---

[4]Afzal also maintains that the trial court erred by holding that benzodiazepine withdrawal cannot be the basis for an insanity defense because it amounts to "voluntary intoxication" under Section 8.04(a) of the Texas Penal Code. Section 8.04(a) states, "Voluntary intoxication does not constitute a defense to the commission of a crime." TEX. PENAL CODE ANN. § 8.04(a) (West 2011). In delivering its decision, the trial court stated,

> Obviously under Section 8.04 of the Penal Code, voluntary intoxication or insanity caused by voluntary intoxication does not allow for the insanity defense.
> The issue here was not whether the defendant was under the influence of Xanax at the time, or some other voluntary intoxication, but whether he was under the withdrawal effects at that time.

Thus, the record shows that the trial court did not reject Afzal's insanity defense based on Section 8.04(a).

named in count two of the indictment.[5] Kahn was forced to remain in her apartment during the duration of the incident.[6]

Officers began communicating with Afzal with a public-address speaker attached to an armored vehicle they had brought to the scene. Officers' initial requests for Afzal to come out of his apartment with his hands in the air were not successful, and Afzal continued to randomly fire the shotgun from his doorway including shots in officers' directions. The armored vehicle was used to remove part of the fence, giving officers better access and visibility to Afzal's apartment and ultimately to knock down the door into the apartment.

Later, officers navigated a remote-controlled robot into Afzal's apartment, allowing them to see the interior of the residence and observe him. Finally, Afzal complied with officers' requests for him to disarm and surrender, telling them that he was hurt[7] and that he needed help.[8]

The record includes evidence on Afzal's mental state and the possible causes for that state.

In the aftermath of the incident, Dr. Edward Gripon, M.D., a psychiatrist, conducted an interview with Afzal[9] and prepared a forensic evaluation, both of which were admitted into

---

[5]Days after the incident, Kahn explained to officers her story. She initially believed Afzal was banging on the walls and maybe arguing with his girlfriend, but she quickly realized that she was hearing gunfire. She tried to exit her apartment, but was then told by officers to get back inside. As Kahn stepped back into the entry of her apartment, she heard Afzal say, "Whose [sic] this . . . bitch? I told you to run while you could. I see you going through the door." Kahn hid under a table in her dining room, fearing for her safety. She remained under the table until the standoff ended. Kahn said the wall that separated her apartment from Afzal's apartment was riddled with bullet holes.

[6]The standoff lasted approximately five hours.

[7]The officers were unaware that Afzal had been shot during the standoff.

[8]Various other Longview officers testified consistent with Higginbotham's version of events.

[9]Gripon's interview of Afzal lasted for about two hours.

7

evidence.[10]  Afzal reported to Gripon that he began using marihuana when he was about sixteen years old and began drinking alcohol when he was around eighteen or nineteen.[11]  Afzal also reported using cocaine and methamphetamine on one occasion.  Afzal explained to Gripon that he had been using benzodiazepine, specifically Xanax,[12] for more than a year at the time of the incident and that he had been taking the drug without a prescription.  Afzal reported experiencing blackouts and memory issues as a result of taking benzodiazepine.  Afzal told Gripon that he had attempted, on two occasions, to discontinue his use of benzodiazepine and that, when he did, he suffered from withdrawal symptoms.  During periods of withdrawal, Afzal would have visual and auditory hallucinations, severe paranoia, and delusional symptoms.  Gripon opined, "Clearly, [Afzal] experienced psychotic symptoms associated with benzodiazepine withdrawal."[13]

Gripon also noted that Afzal had suffered a head injury in October 2014.  Gripon stated that "the medical record reveal[ed] that the small bleed from the closed head injury had long resolved before this incident . . . ."  Regarding the head injury, Gripon explained in his evaluation,

---

[10]In preparing his evaluation of Afzal, Gripon was provided:  (1) Thomas G. Allen's evaluation of Afzal; (2) the offense report of the February 19, 2015, incident; (3) various medical records dated from October 26, 2014, to February 19, 2015; (4) a computer disk containing a full version of the medical reports, still images from the crime scene, and video and audio recordings made by Afzal's girlfriend; and (5) a screenshot from a cell phone.

[11]At the time of the incident, Afzal was approximately twenty-one years of age.

[12]Xanax is a type of benzodiazepine.

[13]According to Gripon, Afzal's version of the incident was as follows:  Afzal's girlfriend had been visiting with him at his apartment when Afzal fell asleep.  When he awoke, his girlfriend was no longer there.  Afzal "freaked out" because he did not know where his girlfriend had gone.  Afzal then began "hearing voices," and he also heard his girlfriend screaming for help "at some type of party next door."  Eventually, Afzal contacted the police and went to retrieve his gun.  He then "yelled next door and started shooting."

Gripon wrote, "[Afzal] realizes, now, that what he was perceiving at that time was part of an altered mental state associated with psychotic symptoms."  He continued, "By history, his symptoms at that time, were associated with benzodiazepine withdrawal."

8

> There were subsequent . . . scans that showed that [any area of bleeding] had resolved and gone away. From the type of injury, you can get anything from nothing to a headache, some depression, some anxiety, some mild confusion. But that's about all you would expect from that type of injury, and you would expect if it is resolved, there wouldn't be any residual of that past the time of resolution.

Gripon conceded, however, that Afzal's head injury "certainly could be a contributing factor" to his psychosis. Gripon also agreed that not all individuals withdrawing from benzodiazepine abuse suffer psychotic episodes. When asked if psychosis from benzodiazepine withdrawal was more of an exception rather than a rule, Gripon stated, "It's the minority . . . You certainly don't see it in every case." Finally, Gripon opined, "In my opinion, I think the most likely reason for the psychotic symptoms, and type of seizure activity, any kind of confusion or state of delirium is associated with the abrupt cessation of benzodiazepine, specifically Alprazolam or Xanax."[14] Gripon's evaluation of Afzal, however, did not contain a specific finding as to whether Afzal knew, or did not know, that his actions were wrong at the time he committed the alleged offense.

Thomas Allen, Ph.D., a licensed psychologist, also conducted an interview with Afzal and prepared a forensic evaluation.[15] During the interview, Afzal informed Allen that he had no problems with alcohol but had abused benzodiazepine. He stated that he took "'street Benzodiazepine' meaning he was buying the medication on the street without a prescription."

---

[14]In concluding his written evaluation, Gripon stated that Afzal's mental state at the time of the incident, "particularly the psychotic symptoms, were a direct result of abrupt Xanax cessation and the withdrawal symptoms associated with that occurrence." Gripon continued, "As noted by his long history, absent the utilization and misuse of Xanax, he does not demonstrate significant psychiatric psychopathology." Gripon opined, "In regard to the issue of sanity/insanity, this entire incident was generated by the volitional taking of and misuse of a benzodiazepine medication which was utilized for self-medication of an underlying anxiety disorder and purchased and utilized without medical supervision."

[15]In order to prepare for Afzal's evaluation, Allen reviewed the parties' discovery, along with recorded information that was contained on two computer disks.

9

According to Allen, Afzal explained that he had suffered a head injury on October 26, 2014, when two individuals hit him with brass knuckles, and he fell backward, hitting his head on the concrete. Medical records showed that Afzal did not lose consciousness as a result of the assault and described his injuries as mild.[16] About a month after the assault, however, Afzal began experiencing anxiety, agitation, hallucinations, and paranoid delusions. Toward the end of November, Afzal's mother and girlfriend took him back to the hospital. Medically, it appeared that Afzal was suffering from benzodiazepine withdrawal.[17] Allen's report stated that, when Afzal's condition worsened, he was placed in "4 point restraints" and "treated with a couple of doses of Haldol (antipsychotic) and Valium ([for] anxiety and [also because Valium is] a benzodiazepine [to ease his withdrawal symptoms]) and was much improved the next day."[18] Afzal's family reported that, during his hospital stay, Afzal made statements such as, "the police are outside and they're coming to search my things." His family also reported that Afzal would

_____

[16]Afzal was admitted to the hospital's emergency room with "acute facial laceration, acute scalp laceration and a left frontal subarachnoid bleed that had been identified on a CT scan. He also had multiple abrasions to all four extremities and a subtle nasal bone fracture."

[17]Afzal informed the medical personnel that he had been taking three to four milligrams of benzodiazepine daily, but that he had refrained from taking Xanax for the previous three to four days. A drug screen from the day of Afzal's admission to the hospital showed positive results for cannabinoids, but negative results for benzodiazepine.

[18]At trial, Allen was asked if Afzal continued to have hallucinations after being medicated for his withdrawal symptoms. Allen stated, "I think it wasn't until the next day that he was better." When asked if the time lapse was significant, Allen said, "I see it as significant and I think most would expect that. If you are withdrawing pretty much from anything, as soon as you start getting that replaced in your system, your symptoms go away pretty fast." During his stay at the hospital, Afzal received a secondary diagnosis of systemic inflammatory response. Allen stated that brain trauma could cause "this core of inflammation."

10

laugh in his sleep and "talk nonsense." Afzal was discharged from the hospital November 25, 2014.[19]

On February 12, 2015, a week before the incident, Afzal returned to the hospital with admitting diagnoses of acute generalized seizure, acute drug abuse, acute dislocation of his left shoulder, and an acute humeral-head fracture.[20] It was reported that Afzal's left shoulder injury was a result of falling while he was walking at work. Afzal did not recall the fall or the reported seizure; however, his girlfriend had seen him fall. She indicated that his eyes rolled into the back of his head and he became unresponsive. During that hospital visit, Afzal's drug screen returned with positive results for both cannabinoids and benzodiazepines. Allen opined, therefore, "[Afzal] didn't have a seizure because of withdrawal." In addition, a CT scan showed a "midline shift" of Afzal's brain. According to Allen, "[T]he midline shift [was] detected because all of that pressure had been building, thus the seizure." Allen stated that he believed there was evidence to show that Afzal suffered from "focal slowing." Allen opined, "I think this is more evidence of involving a brain injury." According to Allen, "I don't care if it is small bleed or not. This is a big deal. It is the brain. And the brain is very soft tissue." When asked if "focal slowing" would occur due to benzodiazepine withdrawal, Allen stated that he did not "think you would expect focal slowing."

On February 18, 2015, the day before the incident, Afzal was taken to the emergency room complaining of shoulder pain from his injury, inability to sleep, dizziness, and headaches. The

---

[19]Afzal's family members, including his mother, reported that Afzal had been behaving erratically prior to receiving the head injury from the assault and that he continued acting in this manner after being released from the hospital. His girlfriend explained that Afzal had suffered from auditory hallucinations, visual hallucinations, and paranoid delusions two days prior to his hospital stay.

[20]A fracture of the humerus, upper arm, in which the head of the humerus is broken.

11

hospital personnel treated Afzal for benzodiazepine withdrawal and then released him from the hospital despite an abnormally high white blood count.

In his written report, Allen noted that Afzal was not intoxicated by benzodiazepine at the time of the charged-offense and that it was unlikely that Afzal's conduct could have been a result of marihuana intoxication. Allen reasoned,

> The defendant had a seizure post head injury and his mother speculated the seizure resulted from benzodiazepine withdrawal. However, the seizure may be proximally related to the head injury as a midline brain shift was medically documented.
>
> . . . .
>
> There is no doubt the defendant was psychotic at the time of the conduct charged and the psychosis was not caused by intoxication. It may have been caused by benzodiazepine withdrawal, but I don't believe the head injury can be ruled out as proximately causing the psychosis or the combination of the 2 factors.

At trial, Allen explained that he believed that it was "too simplistic to say benzo withdrawal" caused Afzal's abnormal behavior, adding, "not when you have all of that other evidence." Allen continued, stating, "I know he wasn't intoxicated on benzos at the time, but I can't say that he was withdrawing" at the time of the alleged offense. Allen opined that, at the time of the incident at issue, Afzal suffered from a severe mental disease or defect that impaired his capacity to appreciate the wrongfulness of his actions. "He was psychotic and was experiencing auditory and visual hallucinations as well as paranoid delusions." Allen concluded, "[A]t the time of the conduct charged . . . [Afzal] was psychotic and did not know his conduct was wrong as defined by the State of Texas."

12

Afzal's mother, Carolyn Denise Warlick, testified about her concern that Afzal's symptoms were caused by something "more" than just his withdrawal from the use of benzodiazepine. Warlick stated that Afzal saw a neurologist after the incident[21] because the family was "afraid something was going on in his mind. . . ."[22]  At that time, Warlick believed that Afzal was no longer taking benzodiazepine.  She also stated that she remembered a physician informing her that there was a midline shift in Afzal's brain.

Longview Police Detective Rebecca Reeves conducted an interview with Warlick during the stand-off with Afzal.  At that time, Warlick stated that (1) she believed Afzal was suffering from withdrawals from his discontinued use of benzodiazepine; (2) his benzodiazepine use was what caused "the problem" that day; (3) Afzal was fine until he began using benzodiazepine; (4) Afzal would not shoot anyone; (5) before the day of the incident, Afzal had been taken to the hospital because he was having hallucinations as a result of withdrawing from benzodiazepine use; (6) Afzal had been taking ten pills a day, and then would stop "cold turkey"; and (7) she wondered whether the assault injuries to Afzal damaged his brain, but the results of the medical procedures "looked all right."

Here, the trial court stated first that "[b]oth [experts] agreed on many parts, including that the defendant suffered from a psychosis at the time of the incident."[23]  In rejecting Afzal's

---

[21]Afzal had been released on bond pending trial.

[22]Afzal's first visit to a neurosurgeon occurred July 22, 2016.  Warlick explained that she had attempted to get Afzal to schedule an appointment with a physician, but it had been difficult to do because of Afzal's busy work schedule.

[23]The trial court also noted, however, that there was some evidence to believe that Afzal knew that his conduct was illegal, basing its finding on the statements Afzal made to Zahn when she was attempting to leave her apartment.  In addition, Gripon's written report failed to include a finding that, as a result of Afzal's mental status, he was unable to

13

affirmative defense of insanity, however, the trial court considered the following evidence: (1) Gripon's testimony that Afzal's psychosis was caused by benzodiazepine withdrawal; (2) Allen's testimony that Afzal's psychosis was the result of an earlier head injury; (3) the medical records from February 12, 2015, noting a midline shift in Afzal's brain, but which also stated, "There is no sign of recent or remote hemorrhage or infarction," and reached the conclusion of "UNREMARKABLE EXAM"; (4) the two additional radiological reports noting Afzal's shoulder injury, but stating, "Exam is otherwise unremarkable"; (5) the number of times Afzal went to the hospital and was found to be suffering from what medical professionals believed to be benzodiazepine withdrawal; (6) lay persons testimony that Afzal's erratic behavior was due to benzodiazepine withdrawal; and (7) text messages from Afzal that indicated he was aware that he needed to discontinue his use of benzodiazepine but that he could not do so "all at once" because of withdrawal issues.

The trial court is the sole judge of the credibility of the witnesses and the weight to be given to the testimony, and the court is free to believe or disbelieve all or part of any witness's testimony. *Alvarado*, 853 S.W.2d at 23. Based on the conflicting evidence presented at trial, we find that the trial court was within its discretion to find that Afzal's psychosis was caused by benzodiazepine withdrawal and not his earlier head injury.

Afzal contends, however, that, even assuming that the benzodiazepine withdrawal could not be ruled out as the cause of Afzal's psychosis, the trial court erred by holding that Afzal's

know his actions were unlawful at the time of the incident. At trial, however, Gripon was asked, "And psychosis would mean that obviously something's going wrong, he *might not know what he was doing was wrong*, hallucinating and those kind of things; is that correct?" (Emphasis added). Gripon responded to the question in the affirmative.

14

insanity defense was barred by Section 8.01(b) of the Texas Penal Code. Section 8.01(a) states, "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01(a). Section 8.01(b) explains, however, "The term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." TEX. PENAL CODE ANN. § 8.01(b). Here, the trial court appears to have relied on Section 8.01(b) in rejecting Afzal's affirmative defense of insanity.

> Based on a totality of the evidence and all the evidence presented to the Court, the Court finds that any mental disease or defect the defendant had, based on the history to his -- of his symptoms, is that the mental disease or defect that he had would have been *the result of* repeated criminal behavior or conduct such as illegal use of Xanax; therefore, I find that the defense has failed to prove by a preponderance of the evidence the affirmative defense of insanity. I find the defendant is guilty of the offense charged.

(Emphasis added).

According to Afzal, the trial court's denying him an insanity defense, on the basis that his psychosis was the result of repeated criminal conduct, is inconsistent with the statutory language describing an abnormality "manifested by" criminal conduct. Afzal contends that the language and intent of Section 8.01(b) is designed to prevent the defense from relying only on evidence of repeated criminal acts and otherwise antisocial conduct to prove an insanity defense.

Citing *Sanders v. State*, 604 S.W.2d 108 (Tex. Crim. App. 1980), Afzal maintains, "It is very different to say that an abnormality is *manifested by* repeated criminal conduct, as opposed to the abnormality being *the result of* repeated criminal conduct." We agree with this part of Afzal's argument. In *Sanders*, the Texas Court of Criminal Appeals read Section 8.01(b) as Afzal

15

urges here. We agree, as did *Sanders*, that subsection (b) does not deny an insanity defense to one whose mental abnormality is *caused by* repeated criminal or antisocial conduct; it says one cannot prove insanity only with evidence of such conduct. *See id.* at 111–12; *see also* TEX. PENAL CODE ANN. § 8.01(b).

While we, therefore, disagree with the trial court's reading of Section 8.01(b), closely related statutory language dictates the same outcome. Section 8.04 of the Texas Penal Code clearly states that "voluntary intoxication" is not a defense to conviction for a crime and then broadly defines "intoxication" as the term is used in Section 8.04. "For purposes of this section 'intoxication' means disturbance of mental . . . capacity resulting from the introduction of any substance into the body." TEX. PENAL CODE ANN. § 8.04(d) (West 2011). This is precisely the situation before us.

Afzal urges us to read into subsection (d) a limitation we cannot find in the statutory language, that, under Section 8.04, intoxication would end when the person is no longer under the direct or immediate intoxicating influence of the substance. While that may very well be the colloquial or common—or even the medical—understanding of the word "intoxication," the statutory definition is not so limited. Notably, subsection (d) nowhere limits the degree of attenuation that might exist between the voluntary ingestion of a substance and a resulting mental disturbance. Intoxication, as so defined within the meaning of Section 8.04, includes any resulting mental disturbance flowing from the introduction of the substance into the body. Here, the trial court apparently found that Afzal's psychosis was caused by withdrawal from the substance, not by a head injury. Within the precise meaning of the phrase the Legislature chose, psychosis

16

directly or indirectly caused by the use of the drug is included within the statutory definition of intoxication, a disturbance of mental capacity "resulting from the introduction" of benzodiazepine into Afzal's body through his voluntary action. Therefore, in our view, the statute denies Afzal his desired insanity defense to the conviction.

Afzal acknowledges finding no Texas authority supporting his core assertion. However, in a Kansas case he cites, seizures during withdrawal from alcohol abuse were allowed to provide an insanity defense, since they were not the immediate result of voluntary intoxication. *See State v. Massey*, 747 P.2d 802, 805–06 (Kan. 1987). But, because we find no suggestion in the statutory language that there is an immediacy requirement or an attenuation exclusion in the definition of intoxication under Section 8.04(d), we disagree with Afzal's contention.

The purpose of the insanity defense is to prevent the State from holding a mentally impaired person criminally accountable for an act that, due to no fault of that person, he or she did not know was wrong. Here, it is uncontested that Afzal had been abusing benzodiazepine for at least a year before the incident at issue. The State presented evidence that he did not have a prescription for benzodiazepine and that he illegally purchased the drug. Afzal's repetitious behavior of taking "street drugs" appears to have been both criminal and antisocial. The State also presented evidence that, when Afzal discontinued his use of benzodiazepine, he suffered from, among other things, hallucinations, blackouts, and disorientation. Thus, evidence supports a finding that such withdrawal directly resulted in Afzal's psychosis.

Sister courts of ours have recognized that psychosis resulting from voluntary drug use falls within the definition of voluntary intoxication. *See Valdes-Fuerte v. State*, 892 S.W.2d 103, 108–

17

09 (Tex. App.—San Antonio 1994, no pet.); *Dominguez v. State*, 661 S.W.2d 759, 762 (Tex. App.—El Paso 1983, pet. ref'd). We agree.

Our reading comports both with the language chosen by the Legislature and with good policy. One who voluntarily and illegally ingests a substance should do so at the risk of whatever mental disturbances flow from that voluntary act, regardless that they may not fit within the common understanding of being "under the influence."

On reviewing the record in its totality, we do not believe that the evidence preponderates to such an extent in Afzal's favor that the trial court's rejection of his affirmative defense of insanity was so against the great weight and preponderance of the evidence as to be manifestly unjust. We overrule Afzal's point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted: July 10, 2018
Date Decided: September 14, 2018

Publish

18