

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

No. 08-24-00372-CR

---

Joshua Anthony Gilbreath, Appellant

v.

The State of Texas, Appellee

---

On Appeal from the 277th District Court
Williamson County, Texas
Trial Court No. 22-1467-K277

---

## MEMORANDUM OPINION[1]

Appellant Joshua Anthony Gilbreath appeals his murder conviction and challenges the

jury's rejection of his insanity defense. We affirm.

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Third Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

# I. BACKGROUND

## A. The murder

On the evening of August 4, 2022, Gilbreath shot and killed 70-year-old Diana Pier in the rural town of Florence, Texas. The relevant sequence of events occurred in the outskirts of Austin, Texas, and the investigation revealed as follows.

Gilbreath spent the afternoon of August 4th drinking alone at Third Base Bar in Round Rock, Texas, where he was a regular. He drank beer and liquor for a little over an hour, left without paying his bill, then drove around and bought more alcohol. Gilbreath eventually returned to his house in Pflugerville, Texas, then drove north and ended up in Florence, Texas.

Timing-advance data from Gilbreath's cell phone confirmed the following location activity. At around 7:45 p.m., two witnesses testified they saw a grey car partially parked in their driveway that took off toward County Road 245 when they approached. Karola Schmidt, who lives on County Road 245, testified that as she prepared to walk her dog, she noticed a silver car parked along the road at the end of her driveway. She intermittently watched the car with binoculars. Schmidt saw a second car parked behind Gilbreath's car. When she looked out again, Schmidt saw Gilbreath walking to his car. He stopped, looked around in both directions, got into the car, and drove south towards County Road 241. Schmidt walked down her driveway to check on the driver of the second car, which remained parked, and found Pier lying face down on the ground. Gilbreath had shot Pier in the forehead; she was pronounced dead at the scene.

Gilbreath then drove to Twin Peaks in Round Rock to drink, then went to Dallas and stayed at a Motel 6. Two days later, Gilbreath went to Bombshells to drink with his longtime friend, Daniel Gonzales. While there, Gilbreath admitted to the murder.

After investigators held a press conference on August 11, they received a tip. Gonzales called authorities to report that Gilbreath had admitted to murdering a woman about a week earlier and that the suspect's vehicle matched Gilbreath's. Gonzales met with detectives that night, and investigators later confirmed that Gilbreath had recently purchased a gun. An arrest warrant was secured on the evening of August 12 and Gilbreath was arrested in the early hours of August 13. Officers recovered a loaded 9 mm firearm from the backseat of Gilbreath's car; a box of ammunition from the driver-side door; loose ammunition on the driver-side floorboard; a receipt for the firearm and ammunition purchase; an open bottle of beer in the center console cup holder; and a bottle of liquor in the front passenger seat. A bullet casing recovered from the scene was tested and confirmed to have been fired from the firearm found in Gilbreath's car. Gilbreath remained jailed until December 2022, when he was released on bond. He was placed on house arrest and was arrested again at Bombshells Restaurant & Bar on March 27, 2023.

**B. Trial proceedings**

Gilbreath was indicted for murder on November 17, 2022. Tex. Penal Code Ann. 19.02(c). After Gilbreath was found to be incompetent to stand trial, the trial court ordered him committed for 120 days following a competency hearing on April 19, 2023. By October 2023, Gilbreath had been reevaluated and was found competent to stand trial. On January 9, 2024, the defense provided notice of its intent to pursue an insanity defense. A nine-day jury trial was held in September 2024.

At trial, the State presented eyewitness, law-enforcement, and expert testimony regarding the investigation and Gilbreath's conduct before, during, and after the murder. The State also offered evidence of Gilbreath's heavy alcohol use, cocaine use, and employment and financial struggles in the months preceding the murder. After the State rested, Gilbreath called family members who testified about his belief that he was living in a "black box" and a "simulation" and

3

about his statements that "the gods are black." He also called officers who testified about his conduct during his arrests. In support of his insanity defense, Gilbreath presented testimony from Maureen Burrows, MD, PhD, who diagnosed him with schizophrenia and opined that he was insane at the time of the murder. In rebuttal, the State called Christine Reed, PhD, who testified that at the time of the murder, Gilbreath was experiencing psychosis resulting from his voluntary substance use. After both sides rested, the trial court instructed the jury that "[v]oluntary intoxication does not constitute a defense to the commission of a crime."[2] The jury returned a guilty verdict, rejecting Gilbreath's insanity defense. The trial court sentenced Gilbreath to 60 years confinement in accordance with the jury's verdict. This appeal followed.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

### A. Applicable law

The affirmative defense of insanity excuses a defendant from criminal responsibility even though the State has proven every element of the charged offense beyond a reasonable doubt. *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). To establish insanity, the defendant must prove that "at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code Ann. § 8.01(a). In the context of insanity, "wrong" means illegal. *Id*. An accused knows that his conduct is wrong if he understands that it is illegal by societal standards, even if, due to a mental disease or defect, he believes his conduct is morally justified. *Ruffin*, 270 S.W.3d at 592. "Voluntary intoxication does not constitute a defense to the commission of a crime." Tex. Penal Code Ann. § 8.04(a). Because the law presumes that the accused is sane, it is the accused who bears the burden to establish

---

[2] Gilbreath also asserted the affirmative defense of self-defense, and the jury charge included an instruction on that defense.

insanity by a preponderance of the evidence. *Ruffin*, 270 S.W.3d at 191–92 ("Texas law . . . presumes that a criminal defendant is sane and that he intends the natural consequences of his acts.").

"The issue of insanity is not strictly medical; it also invokes both legal and ethical considerations." *Bigby v. State*, 892 S.W.2d 864, 877 (Tex. Crim. App. 1994) (citing *Graham v. State*, 566 S.W.2d 941, 952 (Tex. Crim. App. 1978) (en banc)). Though expert witnesses can provide helpful testimony, they "are not capable of dictating determination of that issue" and the jury cannot give conclusive effect to such testimony. *Graham*, 566 S.W.2d at 949. Instead, "[o]nly the jury can join the non-medical components that must be considered." *Bigby*, 892 S.W.2d at 878. Accordingly, the ultimate determination of insanity "lies in the province of the jury, not only as to credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself." *Id*. The jury may determine the accused's mental state at the time of the offense by considering the circumstances of the crime itself, as well as the defendant's demeanor before and after the offense. *McAfee v. State*, 467 S.W.3d 622, 637 (Tex. App.—Houston [1st Dist. 2015, pet. ref'd); *Torres v. State*, 976 S.W.2d 345, 347–48 (Tex. App.—Corpus Christi 1998, no pet.). Relevant considerations include evidence indicating knowledge of wrongful conduct, such as attempts to evade police, expressions of regret or fear of consequences, and any other possible explanations for the accused's behavior. *Id*.

**B. Standard of review**

"In the factual-sufficiency review of a rejected affirmative defense, an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). A

5

reviewing court may sustain a claim of factual insufficiency "only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id*. Rarely will the factfinder's determination of insanity be overturned on appeal. *Graham*, 566 S.W.2d at 953. Accordingly, the jury, as factfinder, is the sole judge of the credibility and weight to be given to the testimony and is free to believe or disbelieve all or part of any witness's testimony. *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex. Crim. App. 1993) (en banc). Because the factfinder has the benefit of observing the witnesses' actions and demeanor, we defer to the factfinder's resolution of conflicting evidence. *Fisher v. State*, 397 S.W.3d 740, 745 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). "Evidence that is factually sufficient" to support a rejection of an insanity defense "is necessarily legally sufficient." *Reyes v. State*, 480 S.W.3d 70, 73 (Tex. App.—Fort Worth 2015, pet. ref'd).

## III. ANALYSIS

In his sole issue on appeal, Gilbreath challenges the factual sufficiency of the jury's rejection of his insanity defense.[3] A review of the parties' theories and the evidence presented will be helpful to our discussion of Gilbreath's insanity defense.

### A. The State's case

The State's theory was that Gilbreath's life was "spiraling our of control" in the months leading to the murder and that his voluntary intoxication could not constitute a legal defense to his conduct.

---

[3] Gilbreath specifically contends that "his evidence is more than sufficient to support his affirmative defense, while the State's evidence is insufficient to rebut it."

The State called Gonzales, who testified that he met Gilbreath in high school and maintained contact with him over the years by socializing at bars. He testified that since 2019, he and Gilbreath went to bars together about three to four times a month. By the summer of 2022, Gonzales described Gilbreath's drinking as "ramping up," with Gilbreath drinking "more heavily and more often." Gilbreath told Gonzales that he was having problems at work, was worried about getting fired, and feared he might lose his house. During this period, Gilbreath regularly used cocaine and mixed it with alcohol. Gonzales testified that Gilbreath said he was depressed and described himself as living in a "black box" and "trapped," as though he were in a "simulation." Gonzales stated that Gilbreath made these comments mostly while intoxicated, though he recalled him making similar remarks on one or two occasions while sober. By August 2022, Gilbreath's drinking continued to increase.

The State also called Ryan Sutton, who also attended high school with Gilbreath and lived with him at the time of the murder. Sutton described Gilbreath as someone who liked to "antagonize," "irritate," and "troll[]" others for reactions, and testified that it was typical for Gilbreath to joke and say random and unexpected things. Sutton and Gilbreath had reconnected when Gilbreath moved back to Texas and Sutton moved into Gilbreath's home in February 2022. Sutton testified that initially, "everything was good" and he knew that Gilbreath drank but "didn't know how bad it was." Sutton stated that Gilbreath frequently went out drinking, carried liquor bottles around the house, and drank directly from them four to five times a week. As Gilbreath's drinking increased, it became daily by the summer of 2022. Sutton testified he also saw Gilbreath use cocaine at home, which he said did not surprise him because Gilbreath had shared stories from college and California and viewed partying as involving drugs. Sutton initially saw cocaine use occur once or twice a week, but said it increased going into the summer of 2022. Sutton further

testified that Gilbreath regularly frequented bars, discussed encounters with prostitutes, and brought them to the house about two to three times a week.

Maggie Wolf, an HR employee at Gilbreath's workplace in Texas, testified that in January 2022, Gilbreath received a salary increase and a large bonus. As 2022 progressed, Gilbreath began missing meetings, performing his work incorrectly, and was "nowhere to be found most of the time." On August 3, the day before the murder, the company decided to terminate Gilbreath and scheduled a meeting for August 5 to notify him. On August 4, the day of the murder, Gilbreath's supervisor sent him an electronic invitation and attempted to confirm the meeting with Gilbreath, but Gilbreath was offline and unresponsive. Instead, Gilbreath was drinking at Third Base. Gilbreath drank alone for a little over an hour, consumed multiple rounds of beer and liquor, left without paying his bill, then drove around and bought more alcohol. He eventually ended up in Florence, Texas, and when Pier saw him parked on the side of the road, she stopped to offer assistance. Gilbreath exited his vehicle and shot Pier in the forehead. Eyewitness testimony established that Gilbreath looked around in both directions "as if wondering if someone was watching," before fleeing the scene. Additional witnesses, including a volunteer paramedic, testified to seeing a silver car fleeing the area without yielding to emergency lights and sirens.

After the shooting, Gilbreath returned toward the area of his home and stopped at a Twin Peaks in Round Rock, where he was a regular. Servers Priscilla Galindo and Sinead Murphy testified that they saw Gilbreath that night. Gilbreath said hello to them, and they noticed that his shirt was inside out, which Gilbreath corrected when they pointed it out. Galindo testified that Gilbreath did not appear to be in distress or in crisis and looked "normal." Gilbreath later drove to Dallas and stayed at a Motel 6.

The following day, Gilbreath missed work and did not attend the scheduled meeting; he was terminated via email. Gilbreath returned home later that day. Text messages admitted into evidence showed that Gilbreath purchased a "g" that day, which the State suggested was consistent with cocaine measurements. Gonzales and Gilbreath then made plans to hang out. Gonzales picked Gilbreath up and testified that Gilbreath was already intoxicated and was carrying a backpack loaded with beer and liquor. While drinking at Bombshells, Gilbreath showed Gonzales his termination letter and expressed worry about losing his job. Gilbreath then told Gonzales that he had something else to tell him. Gilbreath took Gonzales outside, required that they place their phones on top of the car, and directed that they get into Gonzales's car. After imposing these three conditions, Gilbreath confessed to Gonzales that he had pulled over to the side of the road and shot a woman in Jarrell, Texas. Gonzales described that Gilbreath "rested his face into his hands," and repeatedly stated, "Bro, I'm crazy, you don't even understand." Gonzales did not initially believe him. The two went back into the bar then went to Gilbreath's house to change clothes for a night out. They went to Twin Peaks then drove to Austin where they continued to drink on Sixth Street.

On August 8, Gilbreath appeared at work. Wolf testified he asked about his pay, severance, and what the company would tell future employers. That same day, Gilbreath contacted a realtor to list his house for sale. On August 10, Gilbreath and Gonzales hung out again. They went to Bombshells, then to a creek in Austin. Gonzales testified that Gilbreath appeared "a little bit down" and discussed his financial issues. Gonzales said he also discussed disputes with Sutton and threatened to kill Sutton "if [he] tried anything." Sutton confirmed their argument and testified that Gilbreath "moped around the house" during that period. After a press conference on August 11, Gonzales learned about the murder from his father and read an article describing the suspect

9

vehicle and realized that Gilbreath's confession was accurate. Gonzales contacted authorities and met with detectives that same night. An arrest warrant was secured the following day.

Law enforcement set up surveillance around Gilbreath's home late on August 12. U.S. Marshall Emir Perez testified that Gilbreath arrived and instead of parking in his driveway, parked down the street and stayed in his car. He then drove away and after realizing he was not going to return, a search for him began. Perez testified she believed Gilbreath was "actively avoiding surveillance." He was later located in a shopping center, where he remained inside his vehicle for about an hour before his arrest.

Gilbreath remained in custody for approximately five months. Jail records reflected no reported mental health concerns during intake or confinement. While incarcerated, Gilbreath negotiated the sale of his home and confirmed at closing that he was of sound mind to grant his father power of attorney to finalize the sale. Gilbreath was released on bond in December 2022 and placed on level one house arrest with GPS monitoring. Gilbreath's pretrial officer testified that the court imposed no conditions requiring mental health evaluation or treatment.

Gilbreath stayed with his parents, met with counsel, attended court and church, and sought employment. On March 27, 2023, Gilbreath jumped his parents' fence and left the house with his cell phone. He went to Bombshells, appeared without a shirt, and refused to leave after threatening to kill one of the servers and spitting on the DJ. Officers testified that Gilbreath refused to leave after multiple requests and at one point, reached over the bar and grabbed a beer that had been poured for someone else and drank it. Gilbreath resisted arrest, attempted to drink a beer after being handcuffed, and headbutted a beer to the ground. Once outside, he attempted to spit on one of the officers, made racial slurs, and stated that "the gods are black." Officers testified that he

appeared intoxicated and that his behavior was consistent with substance use rather than a mental health crisis.

In jail, Gilbreath threatened to kill officers. Mental health counselor Karen Cotton testified that Gilbreath appeared verbally aggressive, uncooperative, irritable, and agitated. Gilbreath denied mental health issues, told her that "the gods are black," and refused to answer questions about substance use. Cotton reported that Gilbreath appeared to be under the influence of drugs or alcohol and did not exhibit signs of incoherence, disorientation, or mental illness. Because she lacked prior records, Cotton noted that possible psychosis required further evaluation.

## B. The defense's case

The defense asserted that Gilbreath was experiencing a psychotic break caused by schizophrenia at the time of the murder. To support this theory, the defense called officers to testify about Gilbreath's behavior during his arrests. Officers Jordan Tunnell and Luis Serrato were both involved in Gilbreath's criminal trespass arrest on March 27. Tunnell testified that he believed Gilbreath was intoxicated on alcohol or substances, and the defense emphasized that Tunnell did not include intoxication in his report. Tunnell explained he did not include intoxication in his report because Gilbreath was arrested for criminal trespass. Serrato similarly testified that Gilbreath appeared intoxicated on alcohol or drugs and explained that his report focused on the criminal-trespass offense rather than intoxication. Bodycam footage from Tunnell and Serrato shows Gilbreath agitated and defiant and repeatedly stating, "the gods are black," during the arrest. The defense called Cotton, the mental health counselor who evaluated Gilbreath after his March 27 arrest. Cotton testified that Gilbreath appeared paranoid and stated, "the gods are black." The defense questioned her about her report noting the need to rule out schizophrenia. Cotton

11

explained, "that's only because we didn't have any . . . history on him, [it was] just purely upon [Gilbreath's] presentation."

Gilbreath's sister and father also testified. Courtney Gilbreath testified that Gilbreath attended the University of Texas at El Paso, double majored in accounting and finance, and graduated with honors. He worked as a CPA in California then moved back to Texas. Courtney testified she began noticing "changes" in Gilbreath in October 2021. On one occasion, Gilbreath repeatedly called her to ask whether she had been speaking to someone they knew from high school. After Courtney denied it, Gilbreath asked if she was okay and whether she needed any money. Courtney responded she was fine and told him he could send her money if he wanted and he did. Courtney described this as "weird" because Gilbreath was "very frugal." She testified Gilbreath did not remember the incident when she later asked him about it and that she was not close to him in 2022.

Byron Gilbreath testified that Gilbreath had no disciplinary history in high school or college and worked for a large accounting firm in California after graduating. When Gilbreath moved back to Texas in 2020, he lived with his parents for a few months before purchasing a home in Pflugerville. Byron described an incident in April 2022 where Gilbreath came to his home and seemed paranoid. Gilbreath walked into the house without closing the front door and looked around and outside the windows. He asked Byron whether he was living in a simulation, then left, and returned 20 minutes later, appearing calmer. Byron testified this was "very out of character." Byron also testified that during Gilbreath's house arrest, he monitored him and ensured there were no drugs or alcohol in the home. He recalled that Gilbreath said "the gods are black" a day or two before he broke bond and left the house. On the night he left, Gilbreath was sitting on the back porch and when his parents checked on him, he was gone. Byron testified that he and his wife

"didn't know what was going on . . . because he'd never acted like that before. We did not know what it was." On cross examination, Byron acknowledged that Gilbreath did not tell them that he had been fired from his California job and that although he suspected Gilbreath might have been drinking at the time of the April 2022 incident, he was not aware of his alcohol or cocaine use.

The jury also heard conflicting expert testimony regarding Gilbreath's insanity defense. Burrows, a defense expert, testified that she evaluated Gilbreath and diagnosed him with schizophrenia. In forming her opinion, Burrows reviewed Gilbreath's employment records, offense reports, video statements from Sutton and Gonzales, bodycam footage from both arrests, jail records, and notes from her conversation with Gilbreath's parents. Burrows relied on disciplinary write-ups from Gilbreath's California job for cursing, singing loudly, and using a British accent; the "black box" statements Gilbreath made to Sutton and Gonzales; Sutton's report to detectives that Gilbreath exhibited "schizophrenic behavior," talked to himself, and would repeatedly enter and exit the garage; and statements about "the black box" and "the gods are black" made to officers and jail staff. Burrows testified that Gilbreath was psychotic at the time of his second arrest, which she found significant because she believed he lacked access to drugs or alcohol in the preceding months, indicating to her that his psychosis was not substance-induced. Although Burrows acknowledged Gilbreath's cocaine use and believed he "probably dr[a]nk too much," she testified she lacked evidence showing substance use at a level that explained his behavior. As for Gilbreath's conduct at the time of the crime and after, Burrows opined that driving around randomly in Florence, fleeing the scene, purchasing a gun, and instructing Gonzales to place his phone on the car, reflected paranoia consistent with his diagnosis. She also cited his failure to conceal the murder weapon or take property from Pier as supporting insanity and claimed that Gilbreath fleeing to Dallas "makes sense because he [was] scared." Burrows concluded that

13

at the time of the murder, Gilbreath had schizophrenia, did not know his conduct was wrong, and was insane.

On cross examination, Burrows agreed that psychiatry relies on self-reporting and admitted that Gilbreath never disclosed his cocaine use, work-related instances where he was intoxicated, or the true reason for moving back to Texas. Burrows acknowledged that Gilbreath had no diagnosed mental illness before the offense and that no mental health conditions were imposed when he was released on bond. She agreed that his post-offense conduct, such as looking around to see if anyone had seen him, fleeing the scene at a high rate of speed, and attempting to conceal the outside of his shirt, could indicate awareness that his conduct was wrong. The State also pressed Burrows about Gilbreath's omission of key information and his stated reason for fleeing the scene. Although he told both Burrows and Reed that he fled to Dallas because he believed he was in a simulation and feared that people from the simulation were pursuing him from the area of his home, he did not tell either expert that he actually went straight to a bar near his home where he was a regular. Burrows agreed that cocaine is known to cause psychotic symptoms, acknowledged testimony that Gilbreath had used cocaine since April 2022, and conceded that her report did not address his substance use. She ultimately agreed that even when someone exhibits symptoms of a severe mental illness, the insanity defense does not apply if those symptoms result from voluntary intoxication.

### C. The State's rebuttal

The State's rebuttal expert, Dr. Christine Reed, testified that she diagnosed Gilbreath with substance-induced psychotic disorder and concluded he did not meet the criteria for insanity. Reed testified that voluntary intoxication of drugs or alcohol does not constitute a defense to a crime. She explained that substance-induced psychosis can resemble schizophrenia and that

14

differentiation between the two depends on whether a primary mental illness exists or whether substance use is causing symptoms that mimic mental illness. Reed testified that the distinction requires examining when symptoms began, whether they occurred during a clear absence of alcohol or substance use, how long they lasted, and whether they diminished after the effects of substances wore off.

Reed determined that Gilbreath was not insane at the of the murder. She reviewed the same records as Burrows and focused on Gilbreath's conduct in the months and weeks leading to the murder, the day of the offense, and after. Reed testified that Gilbreath did not exhibit overt signs of mental illness during her evaluation and stated that his denial of substance use was concerning because substance use is a critical factor in insanity evaluations. Reed stated that throughout the evaluation, Gilbreath consistently denied cocaine use and presented his alcohol consumption as minimal. Reed testified that much of what Gilbreath reported was inconsistent with the records she reviewed. She noted that although Gilbreath claimed he was overwhelmed and was socially isolating before the murder, the records reflect ongoing social activity and substance use. Reed testified that information from Gonzales and Sutton of Gilbreath's frequent work absences, alcohol and drug use, increased time at bars and strip clubs, and spending large sums of money on prostitutes, "lends itself more to substance abuse problems and the spiraling out of control related to drug use." She also emphasized that Gilbreath had no reported mental health issues before the offense and that jail records from August to December 2022 reflected no mental health concerns, episodes, or diagnoses, indicating that his psychosis was substance induced. His release on bond without any mental health diagnoses or court imposed mental health conditions was also notable to her.

Reed concluded that Gilbreath's alcohol and drug use predated or precluded psychosis symptoms and that periods of sobriety, including incarceration, produced no documented mental health concerns. She testified that most symptoms reported by Gilbreath and others coincided with periods of drinking or drug use, including his second arrest, where he visibly appeared psychotic and agitated, consistent with substance abuse. Reed identified Gilbreath's post-offense conduct as another significant indicator.

Reed testified that Gilbreath told her he shot and killed Pier because he believed he was in a simulation and thought she was involved, and that he fled to Dallas because he believed people from the simulation were coming from his home and were after him. Reed explained that despite this account, records show that Gilbreath fled the scene, returned to the area of his home, and interacted with people at his regular bar—a fact Gilbreath did not disclose to her. Reed opined that this omission was purposeful information that is the opposite of what [Gilbreath] was saying and suggested an attempt to manipulate her opinion. Reed also testified that Gilbreath appeared to know he was under surveillance at the time of his August arrest and took steps to avoid apprehension.

She stated that the conditions Gilbreath imposed on Gonzales before confessing, his instruction not to tell anyone, his failure to report fears of being pursued or killed by people in the simulation to police, and his flight to Dallas to distance himself from the crime scene, demonstrated his awareness that his conduct was wrong. Reed testified that because much of what was occurring was substance induced, Gilbreath experienced substance-induced psychosis and did not meet the legal criteria for insanity.

16

**D. The evidence was factually sufficient to support the jury's rejection of Gilbreath's insanity defense.**

Gilbreath argues "the evidence overwhelmingly showed that [he] was experiencing psychosis caused by schizophrenia before, during, and after the shooting, and [he] did not know his actions were unlawful at the time of the shooting." He primarily relies on Burrows's schizophrenia diagnosis, his "strange behavior" reflected in his California employment records, his difficulty performing his work at his Texas job, and testimony from Gonzales, Sutton, and family members describing changes in his behavior. He also relies on his statements about "the black box" and "simulation," Sutton's descriptions of his conduct, and Sutton's statement to police characterizing his behavior as "schizophrenic." Gilbreath further points to eyewitness accounts from the day of the murder, including his alleged "aimless" and "odd" driving before and after the murder, and his appearance at one of his regular bars with his shirt inside out. According to Gilbreath, the crime lacked any motive "other than his own delusions." He also points our attention to what he characterized as "paranoid" behavior after the murder, including requiring Gonzales to place his phone on the car and making no attempt to conceal the murder weapon. Gilbreath relies on Burrow's conclusion that he remained psychotic after months of sobriety in jail along with the jail notes stating that he "responded to the medication like somebody with schizophrenia would," which he contends shows that mental illness was the underlying cause of his symptoms. He further asserts that the evidence did not support Reed's substance-use conclusions because officers never found drugs on his person during either arrest or his home.

The State responds that the jury was within its discretion to reject Gilbreath's insanity defense. The State maintains that the evidence shows that Gilbreath did not have a severe mental illness at the time of the offense and that his conduct was consistent with knowing his conduct was

17

wrong. The State relies on trial evidence regarding Gilbreath's alcohol and drug use before and at the time of the murder. Citing Texas Penal Code § 8.04(a), the State argues that Gilbreath cannot prevail on his insanity defense due to his voluntary intoxication, as "the trial record is replete with testimony about [his] heavy use of drugs and alcohol." We agree.

Testimony established that in the months leading to the murder, Gilbreath regularly drank at bars and escalated his use to drinking directly from liquor bottles at home on a weekly basis. Testimony also showed that he used cocaine during this period and Sutton specifically explained that Gilbreath's comments about "the black box" and "simulation" increased as his alcohol and cocaine use increased. On the day of the murder, Gilbreath drank several rounds of beer and liquor at a bar, left the bar, bought more alcohol, and drove around. After the murder, the jury heard testimony that Gilbreath was "looking around as if wondering if someone was watching" and "stood there and looked in both directions" before fleeing the scene and driving at a high rate of speed.

Consistent with the record, the State emphasizes that no "witnesses testified to [Gilbreath] having significant mental issues on the day of the offense." Gilbreath's actions after the murder are significant, including leaving the scene and going to Twin Peaks—where he was well known— with his shirt inside out, then going to Dallas for the night. The jury heard Sutton's testimony that Gilbreath told him he went to Dallas and that he was "coked out" and "drunk" around the time. These actions could be construed as consistent with Gilbreath avoiding police, concealing evidence, and attempting to establish an alibi—all while being under the influence. Two days after the murder, Gilbreath continued using alcohol and drugs, and the State argues that his confession to Gonzales and "[his] desire to move to a more private area and be away from cell phones before confessing a murder to his friend shows his fear of being overheard and potentially apprehended."

18

Regarding Burrows's evaluation, the State also argues that the jury could reasonably credit Reed's testimony over Burrows's based on evidence that Gilbreath's symptoms were largely self-reported, that Burrows did not consider his substance use, or that Reed's evaluation proved to be more objective or persuasive.

The jury heard conflicting expert testimony and was free to reject Burrow's opinion and accept Reed's. *See Graham*, 566 S.W.2d at 950–951. A central issue was whether Gilbreath's mental disease or defect caused him not to know that his conduct was illegal. Tex. Penal Code Ann. § 8.01(a). The jury heard evidence of Gilbreath's conduct before, during, and after the murder and could reasonably conclude that he understood his conduct was against the law. Gilbreath's justification that he believed he was in a simulation and feared Pier might have been part of the simulation and might kill him, does not excuse his conduct or establish that he lacked knowledge of its illegality. *Compare McDonald v. State*, No. 05-23-00419-CR, 2024 WL 4784421, at *6 (Tex. App.—Dallas Nov. 14, 2024) (not designated for publication) (holding evidence factually sufficient to support the jury's rejection of appellant's insanity defense where appellant stated she sedated and smothered her children because delusions and hallucinations made her believe her children were being sexually abused), *with Olivier v. State*, 850 S.W.2d 742, 745–46 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (holding evidence factually insufficient to support the jury's rejection of insanity defense where appellant believed the devil was within her and thought she would go to hell if she did not kill the "thing" she was wrestling with in her bed—which was her daughter—and where three doctors provided uncontroverted testimony that the appellant was insane at the time of the offense).

The Texas Penal Code expressly provides that "[v]oluntary intoxication does not constitute a defense to the commission of crime." Tex. Penal Code Ann. § 8.04(a). Evidence showed that

19

Gilbreath voluntarily consumed alcohol and cocaine before the offense and drank on the day of the murder. As factfinder, the jury acted within its discretion in determining that Gilbreath's psychosis was substance-induced. *See Afzal v. State*, 559 S.W.3d 204, 213 (Tex. App.—Texarkana 2018, pet. ref'd) ("Based on the conflicting evidence presented at trial, we find that the trial court was within its discretion to find that Afzal's psychosis was caused by benzodiazepine withdrawal and not his earlier head injury.). "Sister courts of ours have recognized that psychosis resulting from voluntary drug use falls within the definition of voluntary intoxication." *Id*. (citing *Valdes-Fuerte v. State*, 892 S.W.2d 103, 108–09 (Tex. App.—San Antonio 1994, no pet.), *Dominguez v. State*, 661 S.W.2d 759, 762 (Tex. App.—El Paso 1983, pet. ref'd)). We agree.

Based on our review of the record it its entirety, we cannot say that the jury's rejection of Gilbreath's insanity defense was so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 670 n.29, 671. The evidence was factually sufficient to support the jury's determination. Gilbreath's sole issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

MARIA SALAS MENDOZA, Chief Justice

March 5, 2026

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Do Not Publish)

20